## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WILLIAM BASKERVILLE, | : | |
| | : | |
| Petitioner, | : | Civ. No. 13-5881 (PGS) |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | **OPINION** |
| | : | |
| Respondent. | : | |
| | : | |

**PETER G. SHERIDAN, U.S.D.J.**

### I.    INTRODUCTION

Petitioner, William Baskerville, has filed a *pro se* motion to vacate, set aside or correct

his sentence pursuant to 28 U.S.C. § 2255. For the following reasons, the majority of petitioner's

§ 2255 claims will be denied. However, a few of petitioner's claims will require an evidentiary

hearing. Additionally, this Court will reserve judgment on one of petitioner's claims until after

the evidentiary hearing. Finally, this Court will order respondent to file a response to one of

petitioner's motions to expand the record.

### II.    FACTUAL AND PROCEDURAL BACKGROUND

In early 2003, petitioner became a target of the Federal Bureau of Investigation ("F.B.I.")

for his involvement in distributing drugs. (*See* Crim. No. 03-836 ECF 190 Trial Tr. ("T.T.") at

p.3473-74)[1] Deshawn "Kemo" McCray was a paid informant for the F.B.I. (*See* T.T. at p.3396-

97) In January, 2003, McCray began purchasing crack cocaine from Terrell Thomas. (*See id.* at

p.3475-78) Thereafter, Thomas introduced McCray to petitioner. McCray was then advised that

---

[1] Petitioner's trial lasted several weeks. The trial transcript encompasses numerous ECF entries
at Crim. No. 03-836, but is sequential. Therefore, this Court will cite to the page numbers of the
trial transcripts (T.T.) throughout the course of this opinion without the corresponding ECF
number.

he could call petitioner directly on his cell phone if he wanted to purchase drugs. (*See id.* at p.3478) Subsequently, and throughout the course of 2003, McCray made several drug purchases from petitioner.

Petitioner was part of a larger drug organization at the time of McCray's drug purchases from him. Hakeem Curry was the "top guy" of this organization. (*See* T.T. at p.4355) Petitioner was below Curry by a few levels in the organization's hierarchy. (*See id.* at p.4356) Below petitioner was Anthony Young, Jamal McNeil and Jamal Baskerville. (*See id.* at p.4357) Below Young, McNeil and Jamal Baskerville were street-level dealers. (*See id.*)

Ultimately, petitioner was arrested on November 25, 2003. (*See* T.T. at p.3761-62) Paul Bergrin represented petitioner at his initial appearance on the day of his arrest. (*See id.* p.3836) While petitioner was being detained during the period following his arrest, petitioner communicated to Richard Hosten, another person who had sold drugs to McCray. Hosten had been arrested and had an initial appearance the same day as petitioner. Thereafter, when Hosten and petitioner were back at the Hudson County Jail, Hosten heard petitioner mention the name of Kemo to whomever he was speaking to on the telephone. (*See id.* at p.4286) Thereafter, petitioner again told Hosten that Kemo was probably the reason that they were in jail. (*See id.* at p.4277-78)

After petitioner's initial appearance on November 25, 2003, Bergrin and Curry spoke by phone. At that time, Bergrin told Curry that the name of the confidential informant against petitioner was "K-Mo." (*See id.* at p.4352) Young, who was present with Curry at the time of this call between Curry and Bergrin, came to the conclusion that the informant was "Kemo" and not "K-Mo" as stated by Bergrin, because Curry had repeated the name "K-Mo" after Bergin told him it over the phone. (*See id.* at p.4352)

Several days after petitioner's arrest, a meeting among various associates of the Curry drug organization took place at Jamal Baskerville's house. (*See* T.T. p.4359) Curry, Rakeem Baskerville, Jamal Baskerville, McNeil, Young and Bergrin were present. (*See id.*) At this meeting, Bergrin told the group that petitioner would not get bail and that petitioner was facing life imprisonment. (*See id.* at p.4360) However, Bergrin told the group that if Kemo was not around to testify against petitioner, then there was no case, stating, "no Kemo, no case." (*See id.* p.4361)

After Bergrin left, the group remaining then discussed how to find Kemo McCray so that he would not testify against petitioner. (*See id.* at p.4362) Curry and Rakeem Baskerville agreed to pay $15,000 to either Young or McNeil to kill Kemo McCray. (*See id.* at p.4363)

From November, 2003 to March, 2004, Jamal McNeil visited petitioner in jail from time to time. (*See id.* at p.4376) During these meetings, petitioner told McNeil that Kemo McCray needed to be killed quick or else he was going to spend the rest of his life in prison. (*See id.* at p.4376)

On March 2, 2004, McCray was discovered by the Curry drug organization. (*See id.* p.4380) At that time, Curry instructed Young to kill McCray since Young had already been given $7500 to complete the murder. (*See id.* at p.4382) Curry gave Young a gun to kill McCray. (*See id.* at p.4383)

Ultimately, Young and Rakeem Baskerville found McCray in Newark, New Jersey. As McCray was walking with his stepfather, Ronnie Davis, Young approached McCray, then shot and killed McCray. (*See id.* at p.4399-4400)

After McCray had been shot and killed, the F.B.I. visited petitioner in prison to question him about McCray's murder. (*See id.* at p.4753) Petitioner became upset after one of these visits. (*See id.*)

Petitioner had had discussions with other inmates about McCray both before and after McCray's murder. Indeed, Troy Bell, another prisoner, stated that petitioner told him at one point that, "all I know, my informant could be dead. He said, my dudes is looking for him to put a bullet in his melon, but they can't find him." (*See id.* at p.5060) Bell also stated that petitioner told him he knew who his informant was, that he told this information to his brother Rakeem Baskerville, and that he told him to "handle it." (*See id.* at p.5067) Eric Dock, another prisoner, similarly stated that petitioner told him that his brother was out there looking for his informant and that they were "trying to put a hole in his melon." (*See id.* at p.5263) Subsequent to McCray's murder, petitioner told one of his fellow prisoners, Eddie Williams, that he would have been a fool to tell the F.B.I. he had the murder done, even though he did. (*See id.* at p.4753)

In January, 2005, Young came to the F.B.I. to explain that he was involved in the murder of McCray. (*See* T.T. at p.3871) Young knew facts about the murder such as the positioning of McCray's body after he was killed, and that McCray also had a cigarette and a dust mask. (*See id.* at p.3891) Ultimately, Young pled guilty to murdering a witness. Under a cooperating agreement, Young agreed to testify truthfully for the government. (*See id.* at p.4596)

On June 29, 2006, a Fourth Superseding Indictment was returned against petitioner. (*See* Crim. No. 03-836 ECF 82) Petitioner was charged with several counts of drug offenses as well as two counts related to the murder of McCray; namely conspiracy to murder a witness and conspiracy to retaliate against an informant.

In 2007, petitioner went on trial before now retired District Judge Joel A. Pisano.

During jury selection, the District Court and parties settled on a venire of fifty-two potential jurors. The prosecution exercised peremptory challenges to strike four of the five African American venirepersons. The defense objected, claiming that the prosecutors impermissibly used peremptory challenges to prevent African Americans from being seated on the jury. *See Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (holding that the use of peremptory challenges on account of race violates the Equal Protection Clause). In response, the prosecution volunteered explanations for its use of peremptory challenges principally focused on the stricken jurors' attitudes toward the death penalty and relation to convicted criminals. Defense counsel did nothing to challenge the proffered explanations and the District Court overruled defense counsel's objection, finding that the prosecution's reasons were race-neutral, credible, and not pretextual.

Prior to trial, the prosecution filed a motion in limine seeking to introduce statements made by McCray while alive, pursuant to the forfeiture-by-wrongdoing exception to the ban on hearsay set forth in Federal Rule of Evidence ("FRE") 804(b)(6). Rather than hold a pretrial evidentiary hearing to determine whether the exception's elements were met, as defense counsel requested, the District Court reviewed the prosecution's extensive proffer of evidence connecting [William] Baskerville to McCray's murder. The District Court then indicated that it would admit the statements subject to the prosecution's making of the necessary connection at trial. Shortly before the end of trial, the District Court ruled definitively that the prosecution had made the necessary showing to admit McCray's statements under FRE 804(b)(6).

The District Court so ruled based upon evidence that the prosecution introduced in support of the charges against [William] Baskerville related to McCray's murder. That evidence consisted primarily of testimony by the gunman, Anthony Young, who testified that Baskerville had Bergrin transmit McCray's identity as an informant to several associates and told one associate to act quickly in killing McCray or else [William] Baskerville would lose the case. Young understood [William] Baskerville to have instructed the group to kill McCray. [William] Baskerville's cellmate corroborated Young's understanding with testimony that [William] Baskerville admitted lying to F.B.I. agents when he denied having McCray killed.

*United States v. Baskerville*, 448 F. App'x 243, 245-56 (3d Cir. 2011).

One of the witnesses who testified at petitioner's trial was F.B.I. Special Agent Shawn Manson.[2] Manson testified for several days at petitioner's trial. Her testimony included her interactions with McCray as well as evidence McCray provided the government as an informant and purchaser of drugs from petitioner. Another witness for the government was Anthony Young. Young's testimony included phone calls between Bergrin and Curry on the day petitioner was arrested, a meeting between Bergrin and members of the drug organization after petitioner was arrested, his subsequent killing of McCray, and what he did after the killing.

After weeks of testimony, petitioner was eventually convicted by a jury on all counts. The jury declined to impose the death penalty against petitioner. Instead, petitioner was sentenced to nine concurrent terms of life imprisonment. (*See* Crim. No. 03-836 ECF 244)

Petitioner directly appealed to the United States Court of Appeals for the Third Circuit. Petitioner raised the following claims on his initial direct appeal:

1. The prosecutor's proffered reasons for striking four of the five black jurors on the jury venire were pretexts for racial discrimination, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

2. The District Court erred by allowing the government to introduce out-of-court statements made by Kemo McCray.

3. The government failed to present sufficient evidence to prove beyond a reasonable doubt that petitioner was complicit in the murder of Kemo McCray.

Thereafter, the government filed a motion to remand the case to the District Court for further fact-finding. This occurred as a result of the government's appellate attorney who reviewed the

---

[2] At some point after petitioner's trial, Manson changed her last name to Brokos. For purposes of this opinion, and to avoid confusion, this Court will use the last name that the Special Agent had at petitioner's trial, namely Manson.

rough notes from jury selection of the trial Assistant United States Attorneys that were not part of the record on appeal. The Third Circuit granted this partial remand for further proceedings.

On remand, Judge Pisano determined that petitioner's *Batson* objections would remain overruled. Judge Pisano denied petitioner's motion for a new trial. (*See* Crim. No. 03-836 ECF 287 & 288) Thereafter, the matter was again appealed to the Third Circuit. Petitioner added a claim on this appeal that the District Court erred by denying his motion for a new trial because the prosecution did not disclose evidence favorable to the defense.

Ultimately, the Third Circuit affirmed the District Court's judgment of conviction. *Baskerville*, 448 F. App'x 243. The Third Circuit failed to find any error, let alone, plain error, "that would lead [them] to disturb the District Court's ruling that the prosecutor's race-neutral reasons were credible." *Id.* at 247. Furthermore, the Third Circuit noted that they did "not find the points of comparison between jurors that Baskerville urges to be so blatant that the District Court should have easily recognized that the Government's reasons lacked credibility." *Id.* at 248. With respect to the juror notes by the government, the Third Circuit determined that:

> [m]erely making notes of a juror's race, as the prosecution did, is insufficient alone to support a finding of discriminatory intent. Similarly, the grading system used by the prosecutors, without more, does not lead us to conclude that the Government intentionally discriminated.

*Id.* at 249.

The Third Circuit also rejected petitioner's claim that the District Court had erred by admitting McCray's statements pursuant to the forfeiture-by-wrongdoing exception to hearsay under Federal Rule of Evidence 804(b)(6). The Third Circuit determined that the government had made a sufficient showing of petitioner's actions and intent that procured McCray's unavailability at trial. *See Baskerville*, 448 F. App'x at 249-250.

Petitioner's sufficiency of the evidence claim on the murder conspiracy convictions was also denied. Indeed, the Third Circuit stated as follows:

> There was sufficient evidence from which a jury could have found that [William] Baskerville intended to prevent McCray from testifying at his trial. Testimony from Anthony Young, the gunman who shot McCray, supported the jury finding that [William] Baskerville directed Bergrin to pass along McCray's identity to several associates after identifying him as the informant. Further testimony by Young indicated that the associates to whom McCray's identity was passed understood the message to be an instruction from [William] Baskerville to have McCray killed. [William] Baskerville's cellmate corroborated as much when he testified that Baskerville admitted responsibility for the murder because without McCray the prosecution had no drug case against him. This and other evidence, if credited by a jury, could easily lead it to conclude, beyond a reasonable doubt, that [William] Baskerville participated in the conspiracy to murder McCray with intent to prevent him from testifying at trial.

*Id.* at 250–51.

Finally, the Third Circuit denied petitioner's claim raised pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), that the prosecution failed to disclose evidence that Bergrin participated in the murders of witnesses in unrelated cases. *See Baskerville*, 448 F. App'x at 251-52. Indeed, the Third Circuit determined that "[e]vidence that Bergrin helped retaliate against witnesses in other cases would not have proved favorable to the defense." *Id.* at 251. Furthermore, the Third Circuit determined that the undisclosed evidence was not material to petitioner's guilt. *See id.* at 252.

Petitioner then filed a petition for writ of certiorari to the United States Supreme Court. The Supreme Court subsequently denied petitioner's petition for writ of certiorari. *See Baskerville v. United States*, 568 U.S. 827 (2012).

As petitioner's trial was ongoing at the District Court and appellate level on direct appeal, the government brought federal criminal charges against Bergrin. Among one of the charges filed against Bergrin was witness-tampering for his role in facilitating the murder of McCray.

8

Bergrin's criminal proceedings were initially before District Judge William J. Martini. Judge

Martini ordered the McCray murder counts to be severed and tried first and separate from the

rest of the charged crimes against Bergrin. Bergrin went to trial on the two counts related to the

McCray murder in late 2011.[3] Ultimately, that trial resulted in a mistrial after the jury could not

return a verdict. The government then appealed various evidentiary rulings prior to the retrial of

Bergrin. The Third Circuit then vacated one of the District Court's evidentiary rulings and

remanded the matter, albeit to a different District Judge. *See United States v. Bergrin*, 682 F.3d

261 (3d Cir. 2012).

Bergrin was retried in 2013[4] before now retired District Judge Dennis M. Cavanaugh. At

that trial, and most relevant to petitioner's action currently before this Court, Bergrin was

convicted on the counts related to McCray's murder. On appeal to the Third Circuit, Bergrin

asserted that the government provided insufficient evidence to convict him on the counts related

to the McCray murder. The Third Circuit denied this claim, stating as follows:

> The record is replete with evidence to support the Government's
> claim that Bergrin was "house counsel" to Hakeem Curry's drug-
> trafficking organization. In that capacity, Bergrin was retained to
> represent Curry's underlings to ensure that they did not cooperate
> with authorities. One such underling was William Baskerville, who
> was arrested on November 25, 2003, for selling crack cocaine to a
> confidential witness. [William] Baskerville deduced the identity of
> the confidential witness and disclosed it to his lawyer, Bergrin,
> who then called Curry to advise him that the witness was "K-Mo."
> Anthony Young, who was with Curry when he received Bergrin's
> call, recognized "K-Mo" as Kemo McCray. Soon thereafter,
> Bergrin met with Curry and several of his associates. According to
> Young, Bergrin told the group that [William] Baskerville "was
> facing life in prison for that little bit of cocaine," App. 3281, and
> "if Kemo testify against Will, Will was never coming home. He
> said ... don't let Mr. McCray ... testify against Will, and if he don't
> testify, he'll make sure he gets Will out of jail," App. 3282. Bergrin
> repeated: "no Kemo, no case," a phrase he reiterated upon leaving

---

[3] Bergrin's 2011 trial will be designated as "Bergrin I" for purposes of this opinion.
[4] Bergrin's 2013 trial will be referred to as "Bergrin II" for purposes of this opinion.

the group while pointing his finger. App. 3282, 3283. A few months later, Young shot McCray to death.

> Although the aforementioned excerpts from the record are enough to sustain Bergrin's convictions related to the McCray murder, there is much more. For example, Bergrin told another client that he would kill an informant named Junior and that "it wasn't his first time," App. 6855; *see also* App. 6853, which a rational juror could infer was a reference to the McCray murder. Rather than denying culpability, Bergrin boasted to his law partner, Thomas Moran, that the Government lacked evidence to convict him of McCray's murder, further supporting the same inference. Finally, the jury was allowed to infer that Bergrin had the ultimate motive to prevent McCray from testifying against [William] Baskerville because, had [William] Baskerville been incentivized to cooperate against Curry, the Government might have "climbed the ladder" to Bergrin himself.

*United States v. Bergrin*, 599 F. App'x 439, 440–41 (3d Cir. 2014).[5]

After petitioner's direct appeal concluded, he filed a *pro se* § 2255 motion in this Court. Petitioner raises a plethora of claims in his petition. First, he asserts numerous ineffective assistance of trial counsel claims; they are as follows:

1. Failure to investigate audio of March 21, 2003 surveillance video ("Claim I").

2. Failure to investigate phone system at the Hudson County Jail ("Claim II").

3. Failure to investigate Anthony Young ("Claim III").

4. Failure to investigate drug evidence chain of custody ("Claim IV").

5. Failure to investigate witness Anthony Young on material facts ("Claim V").

6. Failure to challenge jailhouse informant testimony ("Claim VI").

7. Failure to challenge drug evidence based on faulty chain of custody ("Claim VII").

8. Failure to object to and challenge speculative and improper testimony from Anthony Young ("Claim VIII").

---

[5] Bergrin has a pending § 2255 motion that is currently pending before Chief Judge Jose L. Linares. (*See* Civ. No. 16-3040)

9. Failure to object to hearsay testimony from Anthony Young ("Claim IX").

10. Failure to object to hearsay testimony by Agent Manson ("Claim X").

11. Failure to object to hearsay testimony from Marshal Cannon ("Claim XI").

12. Failure to meaningfully cross-examine witnesses Manson, Young and Dock ("Claim XII").

13. Failure to properly preserve the *Batson* issue ("Claim XIII").

14. Failure to challenge grand jury irregularities ("Claim XIV").

15. Failure to challenge the obstructive nature of the delays and restrictions relative to discovery ("Claim XV").

16. Failure to object/preserve the jury instruction that relieved the government of its burden of proof on counts 1 and 2 ("Claim XVI").

17. Failure to object/preserve the issue of a constructive amendment of the indictment ("Claim XVII").

18. Failure to object/preserve the jury instruction that insufficiently defined conspiracy ("Claim XVIII").

19. Failure to seek a bifurcated trial ("Claim XIX").

20. Failure to object to an illegal sentence ("Claim XX").

In addition to these ineffective assistance claims, petitioner also alleges that appellate counsel was ineffective for failing to advance the following issues on appeal:

1. The confrontation/hearsay issues stemming from the testimony of Marshal Cannon ("Claim XXI").

2. The insufficient evidence with respect to the agreement element required to sustain the conspiracy convictions in counts 1 and 2 ("Claim XXII").

3. The government's failure to correct known perjured testimony by Anthony Young and Agent Manson ("Claim XXIII").

4. Prejudicial errors with respect to the jury instructions ("Claim XXIV").

5. Sentencing errors ("Claim XXV").

6. Additional plain errors with the trial record ("Claim XXVI").

7. Lack of subject matter jurisdiction as to all charges ("Claim XXVII").

8. Any issues identified with respect to trial counsel's ineffectiveness that could have been raised on appeal ("Claim XXVIII").

Petitioner also claims that he is entitled to relief due to the cumulative errors associated with his ineffective assistance of counsel claims ("Claim XXIX").

Petitioner claims he also has newly discovered evidence which shows that his convictions are constitutionally infirm and should be vacated ("Claim XXX"). Within this claim are numerous sub-claims, they are as follows:

a. Inconsistencies relative to the government's theory as to the motive of the McCray murder.

b. Inconsistent testimony by Manson on the issues of how, when and from whom, she learned information relative to the McCray murder.

c. Numerous material inconsistencies and conflicts with Young's testimony.

d. Additional inconsistencies and conflicts as to highly material matters.

e. Eyewitness information that cast doubt on the foundation of the government's case as related to the murder counts.

Finally, petitioner claims he is entitled to relief due to prosecutorial misconduct ("Claim XXXI"). Again, within this claim there are several subclaims; they are:

a. Withholding audio recordings.

b. Allowing perjured testimony on material matters to go uncorrected.

c. Presenting different theories of motive on the McCray murder at petitioner's and Bergrin's trial.

d. Government gaining an unfair advantage in obtaining favorable evidentiary rulings due to its lack of disclosure of newly discovered evidence.

Respondent filed a response in opposition to petitioner's § 2255 motion. Thereafter, this matter was reassigned to the undersigned in light of Judge Pisano's retirement. Subsequently, petitioner filed a reply in support of his § 2255 motion.

After the matter was fully briefed, petitioner filed several documents seeking to expand the record in this case. The government did not respond to many of these requests except petitioner's most recent motion to expand the record. With respect to petitioner's final motion to expand the record, the government expressly states that it does not object to that particular motion.

### III.    LEGAL STANDARD FOR § 2255 MOTION

A motion to vacate, set aside or correct a sentence of a person in federal custody pursuant to 28 U.S.C. § 2255 entitles a prisoner to relief if "the court finds . . . [t]here has been such a denial or infringement of the constitutional rights of the prisoner as to render judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). "In considering a motion to vacate a defendant's sentence, 'the court must accept the truth of the movant's factual allegations unless they are clearly frivolous based on the existing record.'" *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005) (quoting *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989)) (citing R. Governing § 2255 Cases R. 4(b)). A District Court "is required to hold an evidentiary

hearing 'unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.'" *Id.* (quoting *Forte*, 865 F.2d at 62). The Third Circuit has stated that this standard creates a "'reasonably low threshold for habeas petitioners to meet.'" *Id.* (quoting *United States v. McCoy*, 410 F.3d 124, 134 (3d Cir. 2005) (quoting *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001))). Accordingly, this Court abuses its discretion "if it fails to hold an evidentiary hearing when the files and records of the case are inconclusive as to whether the movant is entitled to relief." *Id.* (citing *McCoy*, 410 F.3d at 134).

## IV. DISCUSSION

Most of petitioner's claims assert that either trial or appellate counsel were ineffective. The Sixth Amendment guarantees effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective. First, the petitioner must show that considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim in light of all of the circumstances) (citation omitted). A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. Under this first prong of the *Strickland* test, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If counsel makes "a thorough investigation of law and facts"

14

about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of the *Strickland* test requires the petitioner to affirmatively prove prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697). Additionally, "claims of ineffective assistance of appellate counsel are also governed by

the *Strickland* standard." *Lusick v. Palakovich*, 270 F. App'x 108, 110 (3d Cir. 2008) (citing *United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000)).

A. Claim I – Failure to Investigate Audio of March 21, 2013 Surveillance Video

In Claim I, petitioner states that was told by his trial counsel that "you could not impeach a federal agent." (ECF 1-1 at p.3) Petitioner asserts that trial counsel's failure to impeach a federal agent manifested itself when trial counsel failed to investigate and impeach Manson with the audio of a surveillance video taken on March 21, 2003. The video was taken by the F.B.I. and shows a drug purchase by McCray. Petitioner claims that the video illustrates that Manson was not certain of highly material matters such as the identity of the subject in the video, specifics of the vehicle used such as the make, model, color, number of doors and license plate number, as well as whether or not a transaction took place. Indeed, petitioner appears transfixed on Manson's statement during trial that "[w]e were able to get the license plate. I actually saw it very clearly, although you can't see it on the videotape." (T.T. at p.3573) Petitioner states that the video was presented at trial without audio and that Manson filled in the gaps at trial regarding audio that was not played. Petitioner then argues as follows:

> Trial counsel failed to investigate the missing information evident
> from the audio and exploit that highly material information to
> demonstrate that Agent Manson gave a narration at trial that was
> entirely inconsistent with her contemporaneous and unintentionally
> recorded understanding of the relevant events even though
> defendant-movant provided the recording and there was no
> strategic reason not to use the same to cast doubt on the narration
> of events provided by Agent Manson at trial . . . . The failure of
> trial counsel to investigate this highly material audio recording and
> use the same to establish the reasonable doubt the recording does
> give rise to was not within the bounds of reasonable competent
> advocacy.

(ECF 1 at p.4)

The government asserts that counsel had a specific trial strategy for not introducing the audio portion of the drug transaction video. Relying on affidavits from petitioner's trial counsel, the government claims that the audio would have served to make the event more real in the jury's mind and the audio would not have contradicted Manson's trial testimony on any material aspect of the drug case. (*See* ECF 16-1 at p.7 & 16-2 at p.8)

This Court ordered the government to provide it with a copy of the video after it failed to do so within its initial filings in this case. (*See* ECF 35) Respondent then complied with that order. This Court has now had the opportunity to review that surveillance video along with its corresponding audio, as well as Manson's testimony at petitioner's trial. For the following reasons, this Court finds petitioner is not entitled to relief on this claim.

The video makes clear that Manson was part of a larger F.B.I. surveillance team on the day it was made, March 21, 2003. While it is true at one point on the video Manson states that she cannot view the license plate of the vehicle in question, a review of the video clearly reveals the license plate of the vehicle. Thus, it was not necessarily inconsistent when she testified that "we were able to get the license plate." (T.T. at p.3573) While it is true that she then testified with respect to the license plate that she "saw it very clearly," presumably meaning when the video was taken, this Court does not see how impeaching her using the audio would have changed the result of the proceeding to a reasonable probability given that the license plate was clearly visible from the video itself. Accordingly, petitioner is not entitled to federal habeas relief on Claim I.

B. Claim II – Failure to Investigate Phone System at Hudson County Jail

In Claim II, petitioner asserts that trial counsel failed to investigate the issue of telephone monitoring/recording capabilities at the Hudson County Jail. He claims that:

> [t]he reason that issue was very important was because it was the
> government's position that defendant/movant made incriminating
> calls with regard to the alleged plot/conspiracy to kill Kemo
> Deshawn McCray ("McCray"), a government informant/witness, at
> issue in Counts 1 and 2 of this case, but that the reason the
> government could not present any recordings to establish that
> premise was because the Hudson County jail did not have the
> capability of recording calls during the time period
> defendant/movant was there . . . . Had trial counsel conducted the
> investigation defendant-movant requested in this regard, it would
> have been learned that the Hudson County jail did in fact have the
> recording capabilities the government claimed it did not have[.]

(ECF 1 at p.5) According to petitioner, had trial counsel investigated the recording capability
issue further, it would have created a basis for the jury to have reasonable doubt to convict him.
Petitioner claims further investigation by counsel would have exposed the jury to the
government's attempt to mislead them on whether the Hudson County Jail had recording
capabilities of inmate phone calls.

At trial, Deputy Marshal William Cannon testified for the government. He testified that
the Hudson County Jail is a facility that the United States Marshals Service detains federal
prisoners. (T.T. at p.5466) He further testified that the Hudson County Jail did not have the
capability of recording prisoners' telephone calls prior to November, 2006. (*See id.*)

With respect to determining whether counsel can be deemed ineffective for failing to
investigate, one court in this District has explained:

> In *Strickland*, the Supreme Court held that trial counsel "has a duty
> to make reasonable investigations or to make a reasonable decision
> that makes particular investigations unnecessary. In any
> ineffectiveness case, a particular decision not to investigate must
> be directly assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's judgments."
> 466 U.S. at 691. "The failure to investigate a critical source of
> potentially exculpatory evidence may present a case of
> constitutionally defective representation," and "the failure to
> conduct any pretrial investigation generally constitutes a clear
> instance of ineffectiveness." *United States v. Travillion*, 759 F.3d

281, 293 n.23 (3d Cir. 2014) (internal quotations omitted); *see also United States v Gray*, 878 F.2d 702, 711 (3d Cir. 1989) (noting that a complete absence of investigation usually amounts to ineffective assistance because a counsel cannot be said to have made an informed, strategic decision not to investigate); *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980).

Where a Petitioner can show that counsel's failure to investigate amounts to deficient performance, he must still show prejudice. In order to do so,

> a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming admissibility in court, would have produce a different result."

*United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987)); *see also United States v. Lathrop*, 634 F.3d 931, 939 (7th Cir. 2011) ("[w]hen a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced"); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome" of Petitioner's case); *accord Untied States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008).

*Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4–5 (D.N.J. May 2, 2016).

Petitioner fails to show that he is entitled to relief on this ineffective assistance of counsel claim. He has come forward with nothing to indicate that further investigation by his trial counsel would have revealed that the Hudson County Jail had the capacity and capability to tape his phone calls during the period at issue. Accordingly, he fails to show prejudice even if counsel had investigated this issue because he has not come forward with any evidence to show that the facility did have the capability to record prisoners' phone calls at that time. *See, e.g., United*

*States v. Williams*, 166 F. Supp. 2d 286, 306-07 (E.D. Pa. 2001) (denying ineffective assistance of counsel claim where defendant made no showing as to what type of evidence would have been revealed with more investigation as "[b]ald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing in habeas corpus matters.") (quoting *Mayberry v. Petsock*, 821 F.2d 179, 185 (3d Cir. 1987)); *see also Lewis v. Mazurkiewicz*, 915 F.2d 106, 115 (3d Cir. 1990) ("With respect to trial counsel's decision not to interview Miller, petitioner has failed to show a reasonable likelihood that such an interview would have produced any useful information not already known to trial counsel[.]") Therefore, petitioner is not entitled to relief on Claim II.

C. Claim III - Failure to Investigate Anthony Young

In Claim III, petitioner claims that trial counsel should have investigated and challenged Young regarding his trial testimony with respect to who was present in Curry's vehicle when Curry received a call from Bergrin at around 4:00 p.m. on November 25, 2003. During this call, Bergrin told Curry that the confidential informant was K-Mo.

At petitioner's trial, Young testified that himself, Curry and Rakeem Baskerville were present in Curry's vehicle when Curry received this call from Bergrin. (T.T. at p.4350-51) However, petitioner states that Curry then called Rakeem Baskerville immediately after Bergrin's 4:00 p.m. call, indicating that Rakeem Baskerville was not in Curry's vehicle at the time of the Bergrin phone call. During this subsequent call, Curry asked Rakeem Baskerville who was K-Mo. Petitioner claims trial counsel had these audio recordings in their possession and that they were ineffective by not impeaching Young on his testimony that Rakeem Baskerville was physically present in Curry's vehicle at the time of the Curry/Bergrin phone call. In his reply, petitioner claims this is important because it relates to when, how and by whom the

confidential informant was identified. Indeed, during petitioner's trial, Young testified that he and Rakeem Baskerville came to the conclusion that the informant was Kemo, not K-Mo as stated by Bergrin during the 4:00 p.m. call to Curry. (*See* T.T. at p.4352)

Even if counsel had investigated and impeached Young on this point of Rakeem Baskerville's presence in the vehicle, it would not have changed the outcome of the proceeding to a reasonable probability. First, whether Rakeem Baskerville was in this vehicle or not at the precise time of the Bergrin call would not have made much difference at trial. Indeed, what was important at trial was what was said on the call. Immediately after the call, Curry called Rakeem Baskerville asking who was K-Mo. Thus, Young's testimony at trial corroborated what was said on the call, namely Bergrin naming the confidential informant as K-Mo. (*See* T.T. at p.4352) Furthermore, the audio recordings indicate that Curry then called Rakeem Baskerville. Young then testified that he and Rakeem came to the conclusion that the informant was Kemo. This is not incredible given Rakeem Baskerville's knowledge immediately after the Bergrin 4:00 p.m. phone call. Accordingly, petitioner fails to show that he is entitled to relief on this claim as he has not shown prejudice.[6]

D. <u>Claim IV – Failure to Investigate Chain-of-Custody Drug Evidence</u>

In Claim IV, petitioner alleges that trial counsel should have fully explored the chain-of-custody drug evidence that McCray purchased from petitioner. Indeed, he states that he asked trial counsel to move to suppress the DEA Form-7 exhibits pertaining to the drugs since there was a break in the chain-of-custody. In his reply, petitioner bases his chain-of-custody argument as follows:

---

[6] To the extent that petitioner also asserts in this claim that the prosecutor's knowingly permitted perjured testimony by allowing Young to testify Rakeem Baskerville was present, that argument will be discussed *infra*.

> Petitioner asserts that the Government failed to establish a
> sufficient chain of custody showing that the cocaine described in
> DEA Form-7 report was the same substance seized on the
> occasions described in the indictment. Where the DEA Form-7
> reports describe alleged seizures from the "Crips Street Gang," the
> indictment alleged controlled purchases from Petitioner.

(ECF 29 at p.25)

Petitioner is not entitled to relief on this claim. Manson explained at trial why some of the

DEA Forms listed the drug evidence as coming from the "Crips Street Gang." Petitioner is

correct as a factual matter that some of the forms do indeed state that the evidence came from the

"Crips Street Gang" while others state the evidence came from William Baskerville. However,

Manson explained that they did not convert the paperwork until April, 2003, because that is

when the investigation shifted to specifically target William Baskerville. (T.T. at p.4001) Thus,

this difference does not show a break in the chain-of-custody necessarily.

Furthermore, it is worth noting that trial counsel did elicit from Manson at trial that there

were errors in the forms. More specifically, counsel elicited from Manson that some of the forms

indicated that the drugs were "seized" when in actuality they should have been marked as

"purchased." (*See* T.T. at p.4001-02) The Supreme Court has explained that chain of custody

gaps go to the weight of the evidence, not their admissibility in the ordinary case. *See Melendez-*

*Diaz v. Massachusetts*, 557 U.S. 311 n.1 (2009); *United States v. Rawlins*, 606 F.3d 73, 82-83

(3d Cir. 2010) (noting while serious gaps may render a chain of custody so deficient that

exclusion is required, "in the ordinary case gaps in the chain go to the weight of the evidence, not

its admissibility.") (internal quotation marks and citations omitted). Trial counsel noticed and

brought forth at trial the errors in the forms for the jury to consider. Accordingly, and for these

reasons, petitioner fails to show that he is entitled to relief on this ineffective assistance of

counsel claim.

E. Claim V – Failure to Investigate Anthony Young on Material Facts by Calling Other Witnesses

In Claim V, petitioner argues that certain witnesses who were not called by his trial counsel would have established that Young's testimony on material matters was false. According to petitioner, these witnesses would have challenged Young's credibility on several points, such that their testimony would have created reasonable doubt as to his two convictions arising out of the murder of McCray.

     i.   *Jamal Baskerville & Jamal McNeil*

Petitioner argues that trial counsel should have investigated and called as witnesses Jamal Baskerville and Jamal McNeil. Petitioner submitted his own declaration regarding what their testimony would have been if counsel had investigated and called them at trial. With respect to Jamal Baskerville, petitioner asserts in his declaration that Jamal Baskerville would have testified at trial as follows: (1) that there was no meeting in front of his house on November 25, 2003 between Diedra Baskerville, Rakeem Baskerville, Jamal McNeil, Hamid Baskerville, Hakeem Curry and Anthony Young; (2) that there was no second meeting 4-10 days after petitioner's arrest between Paul Bergrin, Hakeem Curry, Rakeem Baskerville, Jamal McNeil and Anthony Young where Bergrin said "No Kemo, no case"; (3) that he never told Young where he could find McCray so he could kill him; and (4) that petitioner never communicated to him that he wanted him or anyone else to harm McCray. (ECF 1-1 at p.6)

With respect to Jamal McNeil, petitioner asserts in his declaration that McNeil would have testified as follows: (1) that he did not attend any meeting on November 25, 2003 at Jamal Baskerville's house among Diedra Baskerville, Rakeem Baskerville, Hamid Baskerville, Jamal Baskerville, Hakeem Curry and Anthony Young; (2) that petitioner never implied that he wanted

anyone to kill McCray; (3) that he never communicated to anyone that petitioner wanted anyone

to kill McCray; and (4) that petitioner had no knowledge of the conspiracy to kill McCray.

Petitioner is not entitled to relief on his claim that his attorney failed to investigate and

call Jamal Baskerville[7] and Jamal McNeil as witnesses. In the ineffective assistance of counsel

context, "[p]rejudice 'requires more than just a 'conceivable' likelihood of a different result." *Ali*

*v. Nogan*, No. 13-7364, 2016 WL 8678443, at *7 (D.N.J. Apr. 1, 2016) (quoting *Grant v.*

*Lockett*, 709 F.3d 224, 235 (3d Cir. 2013) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 792

(2011))) (other citations omitted). In *Duncan v. Morton*, 256 F.3d 189, 202, (3d Cir. 2001), the

Third Circuit found that a habeas petitioner's failure to present any sworn testimony by the

witnesses the habeas petitioner claimed counsel should have investigated and called as a witness

amounted to a failure to establish *Strickland* prejudice. *See id.* ("In light of Duncan's failure to

present any sworn testimony *by Sherman*, he has failed to establish prejudice as a result of

[counsel's] failure to interview Sherman.") (emphasis added). In the § 2255 context, other courts

have similarly found that a petitioner needs to provide a sworn statement of fact from the

proposed witness regarding what they would have testified to if a § 2255 petitioner is to establish

*Strickland* prejudice. *See Huggins v. United States*, 69 F. Supp. 3d 430, 446 (D. Del. 2014)

(noting that movant did not provide an affidavit from the witness stating that he would have been

available to testify and or describing his potential testimony); *Karamos v. United States*, No. 04-

0171, 2005 WL 2777552, at *4 (D.N.J. Oct. 24, 2005) ("[T]he Court cannot conclude that

Petitioner was prejudiced by counsel's failure to investigate or call these individuals as witnesses

---

[7] It is worth noting that Bergrin attempted to call Jamal Baskerville as a witness in Bergrin I. After Jamal Baskerville met with an attorney, it was represented by counsel that Jamal Baskerville would plead his Fifth Amendment rights. (*See* 09-cr-369 ECF 317 at p.117) Jamal Baskerville thus never testified during Bergrin's criminal proceedings.

because Petitioner has failed to provide a sworn statement of facts from any of the seventeen detailing their proposed testimony.")

In this case, petitioner failed to provide any type of sworn statements from Jamal Baskerville and Jamal McNeil that they would have been willing or able to testify. Given this omission, petitioner's declaration as to what these witnesses would have testified to amounts to speculation that is insufficient to grant him relief, or at a minimum, conduct an evidentiary hearing on this claim with respect to these two witnesses.

     *ii.*     *Paul Feinberg, Esq.*

Petitioner also claims that he requested that counsel contact Paul Feinberg, Esq., as a potential witness. Feinberg was Young's original lawyer. According to petitioner, he requested that counsel investigate Feinberg to determine: (1) whether he represented Young when he contacted the F.B.I. on January 14, 2005 as he claimed; (2) whether he had ever advised Young to not implicate himself and lie to the F.B.I. while meeting them; and (3) whether he gave Manson consent for the F.B.I. to speak to Young outside of his presence when he was Young's attorney.

Like Jamal Baskerville and Jamal McNeil, petitioner fails to include an affidavit from Feinberg with his filings in this case. However, unlike Jamal Baskerville and Jamal McNeil, this Court does have sworn testimony from Feinberg as he testified for the defense in both Bergrin I and Bergrin II.

Petitioner was not prejudiced by counsel's failure to call Feinberg as a witness at petitioner's trial. In Bergrin I, Feinberg testified that he represented Young for a short period of time in late 2004 and early 2005, but that when Young stopped paying him, he told him that he could no longer represent him and that he should go to the Federal Defender's Office and ask for

representation. (*See* 09-cr-369 ECF 317 at p.30-31) Feinberg also testified that he told Young

that if he was going to go to the F.B.I. that he had to tell the truth. (*See id.* at p.31) Feinberg

further told Young that he should not implicate himself if he talked to the F.B.I. (*See id.*)

Feinberg testified similarly in Bergin II. (*See* 09-cr-369 ECF 524 at p.34-37)

This Court fails to see how, if Feinberg testified similarly at petitioner's trial as he had in

Bergrin I and II, that the outcome of petitioner's trial would have been different to a reasonable

probability. Therefore, petitioner has failed to show prejudice with respect to counsel's failure to

investigate/call Feinberg as a witness.

    *iii.*    *Paul Bergrin*

Petitioner provided a certification from Paul Bergrin in this action. (*See* ECF 29 at p.76-

81) In his certification, Bergrin states that he represented petitioner in his federal criminal case

from November 25, 2003 until 2005. (*See id.* at p.76) Bergrin states that trial counsel interviewed

him and that he agreed to truthfully testify on petitioner's behalf. (*See id.* at p.77) Bergrin

explains that petitioner never expressed any intent to kill or cause harm to McCray. (*See id.*) He

states that from early on, the plan was for petitioner to plead guilty. (*See id.* at p.79) Bergrin

denies "attending, setting up, being present at any meeting with anyone and ever uttering the

words, 'No Kemo, No Case.'" (*Id.* at p.80) He further states that there:

> was never a meeting on Avon Avenue, Newark, New Jersey, nor at
> any other location between [Bergrin], Rakeem Baskerville,
> Hakeem Curry, Jamal McNeil, Jamal Baskerville and Anthony
> Young, wherein [Bergrin] ever informed any of these individual's
> that if Kemo was killed or even unavailable as a witness, that I
> would win William Baskerville's case and he would go free; that if
> Kemo testifies that William Baskerville would be convicted and
> get life in prison. This was never stated by me to any person, never
> even entered my thought process and no meeting ever held wherein
> I ever stated this.

(*Id.*)

As one court in this District has noted:

> Where a petitioner challenges his counsel's decision as to which witnesses to call, courts "are 'required not simply to give [the] attorney[ ] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as he did.'" *Branch v. Sweeney,* 758 F.3d 226, 235 (3d Cir. 2014). "*Strickland* requires that a defendant 'overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' 466 U.S. at 689, 104 S. Ct. 2052 (internal quotation marks omitted). If the Government 'can show that counsel actually pursued an *informed* strategy (one decided upon after a thorough investigation of the relevant law and facts),' the effectiveness of counsel's assistance is 'virtually unchallengable.' *Thomas v. Varner,* 428 F.3d 491, 500 (3d Cir.2005)." *United States v. Graves,* 613 F. App'x 157, 159–60, 2015 WL 3406548, at *2 (3d Cir. May 28, 2015).

*Judge v. United States,* 119 F. Supp. 3d 270, 284–85 (D.N.J. 2015).

In this case, Bergrin's own certification indicates that petitioner's trial counsel interviewed him. Thus, this does not appear to be a situation where petitioner's trial counsel failed to investigate Bergrin. Both of petitioner's trial counsel provided affidavits setting forth their reasons for not calling Bergrin as a witness. For example, Kenneth W. Keyser, Esq. states that he:

> would have never called Mr. Bergrin as a defense witness. First, he was Mr. Baskerville's original attorney who was conflicted out of the case. Issues may have arisen as to the attorney-client privilege, and the Government may have been entitled to elicit otherwise privileged communications of Mr. Baskerville on cross-examination. Additionally, Mr. Bergrin was, according to the Government, "house counsel" for the Curry organization. Any such evidence elicited in front of the jury would have damaged Mr. Baskerville, as the Government claimed Mr. Baskerville was a part of this organization. Mr. Bergrin's bias to protect the organization may have been brought out, and, coupled with the allegation that Bergrin was an unindicted co-conspirator in the McCray murder, his testimony may have been seen as self-serving and lacking credibility. Additionally, I emphasized during the summation in the guilt phase that Bergrin, as "house counsel,' was principally responsible for McCray's death. This theme was also brought up in

the opening of the penalty phase to point out that Bergrin was not
facing any charges, let alone the death penalty.

(ECF 16-2 at p.14-15) Carl Herman, Esq. also submitted a declaration. In it, he stated similar

reasons as did Mr. Keyser for why Bergrin was not called as a witness. (*See* ECF 16-1 at p.13)

This Court finds that petitioner's trial counsel's decision not to call Bergrin as a witness

was based on an informed trial strategy that petitioner fails to overcome. Therefore, petitioner is

not entitled to relief on counsel's failure to call Bergrin as a witness at his trial.

    *iv.*    *Diedra Baskerville*

Petitioner next asserts that counsel should have investigated and called Diedra

Baskerville, petitioner's now ex-wife, as a witness at his trial. Petitioner does include a

declaration from his ex-wife in which she states that she would have testified that she "did not

attend any meeting on November 25, 2003 at the residence of Jamal Baskerville." (*See* ECF 29 at

p.84) She further states in her declaration that she would have testified that she had no

transportation on that day because the F.B.I. had taken her vehicle when they had arrested her

husband at the time, and that she had never met Young prior to his appearance in Court at

petitioner's 2007 trial. (*See id.*)

Petitioner claims that Diedra's testimony would have refuted Young's testimony that she

was present when Young arrived at Jamal Baskerville's house the morning petitioner got

arrested. This Court fails to see how her testimony would have changed the outcome of the

proceedings to a reasonable probability as her presence at this November 25, 2003 meeting was a

minor point. Furthermore, as petitioner's trial counsel notes in their declarations, her bias was

obvious. Therefore, petitioner is not entitled to federal habeas relief on this claim.

*v.*     *Hakeem Curry & Rakeem Baskerville*

Petitioner next argues that trial counsel was ineffective for failing to investigate and call as witnesses Hakeem Curry and Rakeem Baskerville. Both of these individuals provided declarations in this matter. Hakeem Curry states as follows in his declaration:

> Had Mr. Baskerville's attorney called me as a defense witness I would have testified under oath that I had no role in any sort of conspiracy to kill Deshawn McCray because of his status as an informant/witness against Mr. Baskerville.
>
> I would have further testified that Mr. Baskerville never communicated any desire to me that he wanted any harm to befall Deshawn McCray.
>
> I also would have testified that I never suggested in any way that anyone should harm Desahwn McCray, nor would I have condoned or entertained anyone else's desire to harm Deshawn McCray because of his status as an informant/witness against Mr. Baskerville.

(ECF 29 at p.82-83)

Rakeem Baskerville stated as follows in his affidavit:

> I would have testified that I had no involvement in, nor knowledge of, any plot, scheme, or conspiracy to kill McCray as alleged in the above-entitled cause and action.
>
> I would have testified that I did not attend, and have never attended, any meeting at Jamal Baskerville's home on 25 November 2003 with Diedra Baskerville, Jamal Baskerville, Hamid Baskerville, Jahmal McNeil, Hakim Currie, Anthony Young and Paul Bergrin as alleged in the above-entitled cause and action.
>
> I would have testified that I was not in Hakim Currie's vehicle on 25 November 2003 with Anthony Young and Hakim Currie when it is alleged that Paul Bergrin called Hakim Currie and gave him the name "K-Mo."
>
> I would have testified that I did not attend any meeting 4-10 days after William Baskerville's arrest where it is alleged that a meeting occurred between myself, Paul Bergrin, Hakim Currie, Anthony

Young, Jahmal McNeil and Jamal Baskerville where it is further alleged that Paul Bergrin stated "no K-Mo, no case."

I would have testified and refuted the allegation that I was involved in any aspect of the McCray murder and that any such testimony to that effect was false.

I would have testified William Baskerville never communicated to me in any way that he wanted any act of violence carried out against McCray as alleged in the above-entitled cause and action.

(ECF 29 at p.85)

Mr. Kayser and Mr. Herman state in their declarations that they chose not to call Rakeem Baskerville because he had already been convicted and sentenced along with Hakeem Curry to life in prison for participating in a drug conspiracy in a separate criminal proceeding. (*See* ECF 16-1 at p.14; ECF 16-2 at p.16) According to them, Rakeem Baskerville would not have aided petitioner at his trial even if he would have waived his Fifth Amendment rights. According to petitioner's trial counsel, Rakeem Baskerville would have caused serious damage to the defense's ability to maintain credibility with the jury. (*See id.*) Mr. Kayser and Mr. Herman's declarations though are relatively silent about why they chose not to call Hakeem Curry as a witness, except for mentioning in passing that Curry had already been convicted and sentenced to life imprisonment for participating in a drug conspiracy in a previous trial.

It is a true that both Rakeem Baskerville and Hakeem Curry had already been tried, convicted and sentenced to life imprisonment on various federal drug charges in a separate criminal proceeding at the time of petitioner's trial in 2007. (*See* Crim. No. 04-280) However, neither was tried and convicted on charges arising from the murder of McCray. Both Rakeem Baskerville and Hakeem Curry state in their declarations that they had no part in the conspiracy to murder McCray. This is despite Young's testimony at petitioner's trial to the contrary.

At the present time, and out of the abundance of caution, this Court will conduct an evidentiary hearing as it relates to trial counsel's purported ineffectiveness for failing to call these two purported unindicted co-conspirators for McCray's murder as witnesses at petitioner's trial. *See, e.g., United States v. Sellner*, 773 F.3d 927, 929 (8th Cir. 2014) ("The district court is not permitted to make a credibility determination on the affidavits alone.") (internal quotation marks and citation omitted).

This Court expects to hear testimony from Mr. Herman and Mr. Kayser at this hearing regarding their investigation into these two witnesses, and their reasons for choosing not to call either witness at trial. This will give this Court a better understanding of whether their decision not to call these two witnesses could be considered sound trial strategy.

Additionally, this Court will also expect to hear testimony from Rakeem Baskerville and Hakeem Curry at the evidentiary hearing. Among the items that this Court will seek to hear testimony about is whether these two witnesses were ready, willing and able to testify at petitioner's trial, whether defense counsel or anyone on the defense team met with them to discuss what their possible testimony would be as well as what they would have testified to at trial. Finally, petitioner may also wish to testify at the evidentiary hearing. Among the items this Court is interested in hearing from petitioner would be what, if anything, he told his counsel about Hakeem Curry and Rakeem Baskerville's willingness to testify, as well as what, if anything petitioner told his counsel regarding the nature of what these two witnesses would testify to if called as witnesses.

*vi.* *Rashidah Tarver*

The next witness that petitioner asserts that trial counsel should have investigated and called as a witness is Rashidah Tarver. Petitioner attached Ms. Tarver's declaration to his reply brief where she states as follows:

> I am aware that I was falsely accused by Anthony Young in which he had testified that I had driven him and Rakeem Baskerville back in March of 2004 to an auto boby [sic] shop to dispose of a gun.

> I had given testimony in the matter of <u>United States v. Paul Bergrin</u>, and my testimony was consistent in both of Mr. Bergrin's 2011 and 2013 trials to which I denied all of these false claims of Anthony Young of my involvement or having knowledge of those things which he has alleged.

> Had I been called as a witness at the time of William Baskerville's trial, at which time I was available and willing to testify, I would have given testimony denying Anthony Young's false allegations that, I had driven him and Rakeem to a body shop to dispose of a gun in March of 2004 or at any other time.

> I would had also testified that I have never driven Anthony Young and Rakeem Baskerville anywhere ever.

> Also I have never been contacted or interviewed by any investigator or the attorneys' of William Baskerville in relations to the matter of Mr. Baskerville.

(ECF 29 at p.86)

Petitioner's trial counsel's declarations each state that Ms. Tarver was interviewed by a defense team investigator, but that it was determined she was of no value and would not make a good witness. (*See* ECF 16-1 at p.15; ECF 16-2 at p.16-17)

This Court will not decide this claim under the first prong of *Strickland*. Indeed, there is a factual dispute between Ms. Tarver and petitioner's trial counsel whether she was ever interviewed. Accordingly, the claim will be analyzed to determine whether there was any prejudice.

This Court finds that there was no prejudice to petitioner. Ms. Tarver's testimony related to a tangential and relatively minor issue of whether she drove Young after the murder to an auto body shop where the gun was destroyed after McCray was murdered. This testimony would not have changed the outcome of the proceedings to a reasonable probability. Thus, petitioner is not entitled to relief on this claim.[8]

F. Claim VI – Failure to Challenge Jailhouse Testimony

In Claim VI, petitioner alleges that trial counsel failed to challenge the testimony of Eric Dock, a jailhouse informant. According to petitioner, trial counsel should have called Bergrin during a pre-trial hearing to advance an argument that Dock had obtained information about the murder not from petitioner's admissions, but from pre-trial discovery that was in Baskerville's cell that Dock had supposedly accessed.

Petitioner is not entitled to relief on this claim. He comes forward with nothing to indicate that Bergrin could or would have testified as to what was the actual source of Dock's information. Thus, petitioner fails to show prejudice.

G. Claim VII – Failure to Challenge Drug Evidence based on Faulty Chain-of-Custody

In Claim VII, petitioner reiterates his claim that trial counsel was ineffective in failing to challenge the drug evidence based on faulty chain-of-custody. As detailed in *supra* Part IV.C, petitioner is not entitled to relief on this claim. Therefore, it will be denied.

H. Claim VIII – Failure to Object/Challenge Speculative/Improper Testimony

In Claim VIII, petitioner argues that trial counsel failed to object to improper testimony from Anthony Young. More specifically, petitioner asserts counsel should have objected when Young testified relative to McCray's name being passed along to him and what it meant when

---

[8] It is worth noting that Ms. Tarver did testify during Bergrin II, but the jury convicted Bergrin nevertheless of conspiracy to murder McCray.

Young said that the name being passed along meant "if you cross the Baskerville's and somebody give you the name who did it, get rid of 'em," as well as to information from petitioner whereby Young said it was a "demand." (*See* Dkt. No. 1-1 at p.8)

Trial counsel state in their declarations that there was no strategic value in challenging either of these claims. This Court agrees. Petitioner fails to state what the legal significance of a request as opposed to demand to kill McCray. Furthermore, there was no strategic reason to object to Young's testimony about how he interpreted the communication from Baskerville regarding McCray since it was relevant to explain Young's subsequent actions. Accordingly, petitioner is not entitled to relief on this claim.

I. Claim IX – Failure to object to hearsay testimony of Young

In Claim IX, petitioner argues that his trial counsel failed to object to hearsay testimony by Anthony Young. Petitioner's objection relates to Young's testimony that petitioner told Jamal McNeil that they had to hurry up and get rid of the confidential informant. (*See* ECF 1-1 at p.8)

> Rule 801 of the Federal Rules of Evidence explains that a statement is not hearsay if "the statement is offered against an opposing party and ... was made by the party's coconspirator during and in furtherance of the conspiracy." The Rule thus imposes two predicate inquiries before a statement will be admitted: (1) the statement must be made by a coconspirator, and (2) the statement must be made during the course of and in furtherance of the conspiracy. Both requirements must be satisfied by a preponderance of the evidence.

*United States v. Stimler*, 864 F.3d 253, 273 (3d Cir. 2017) (footnotes and citations omitted). Petitioner's statement to McNeil falls within the co-conspirator exception to hearsay. Counsel was not ineffective for failing to object to the introduction of this testimony because the objection would have been overruled.

J. Claim X - Failure to object to hearsay testimony by Agent Manson about statements made by McCray prior to his death

In Claim X, petitioner argues that "[t]rial counsel failed to object to hearsay testimony based on statements McCray allegedly made to Agent Manson prior to his death and counsel also failed to object to certain audio recordings being admitted." (ECF 1-1 at p.9)

Federal Rule of Evidence 804(b)(6) provides an exception to the hearsay rule when the "statement is offered against a party that wrongfully caused – or acquiesced in wrongfully causing – the declarant's unavailability as a witness, and did so intending that result." Fed. R. Evid. 804(b)(6).

This issue was the subject of a motion in limine filed by the government at petitioner's trial. (*See* Crim. No. 03-836 ECF 102) Petitioner's counsel filed a response to that motion in which they requested an evidentiary hearing to determine if the government had met its burden. (*See id.* ECF 106) Ultimately, the Court stated as follows with respect to the motion in limine:

> I suppose we have to take it as it comes. I don't know what more to tell you, other than to suggest to the Government that I would hope that you would present the proofs on these threshold issues in such a way that it makes orderly sense and I would suggest, I don't know that it is determinative, but I would suggest that this sort of issue not, to the extent it can be avoided, not be the kind of thing that comes in subject to connection later on.

(*Id.* ECF 123 at p.14)

An issue on petitioner's direct appeal was whether the trial court erred by admitting McCray's statements pursuant to Federal Rule of Evidence 804(b)(6). *See Baskerville*, 448 F. App'x at 249. Ultimately, the Third Circuit explained that, "[t]he District Court's admission of McCray's statements did not constitute error because the Government's proffer made a sufficient showing of Baskerville's actions, and intent, to procure McCray's unavailability." *See id.* Thus,

as the Third Circuit noted, the government made a sufficient enough showing to permit the introduction of McCray's statements at trial. *See id.* at 249-50.

With respect to petitioner's argument as to trial counsel's purported ineffectiveness for failing to raise an objection to this testimony, he fails to show that he would be entitled to relief as any objection by petitioner's trial counsel on hearsay grounds to the admission of these statements would have been denied. *See United States v. Nguyen*, 379 F. App'x 177, 181-82 (3d Cir. 2010) (denying claim in part that argued counsel was ineffective for failing to object to hearsay when if the objections were made they would have been rejected). Accordingly, petitioner is not entitled to relief on this claim.

K. Claim XI – Failure to object to hearsay testimony by Marshal Cannon

In Claim XI, petitioner states that Marshal Cannon testified that the Hudson County Jail lacked capabilities of recording prisoner phone calls while petitioner was detained there. With respect to his claim for relief, petitioner asserts that "[t]rial counsel failed to object to the hearsay-within-hearsay testimony of Marshal Cannon when they learned during cross-examination that the information that formed the basis of his testimony at issue came from an unknown and unidentified source." (ECF 1-1 at p.9)

For context, during cross-examination, the following colloquy took place between petitioner's trial counsel and Cannon:

> Q: You say that Hudson didn't have the capability of recording phone calls?
> A: No, they did not.
> Q: And how were you aware of that?
> A: I was told by the Hudson County Jail, our point of contact there.
> Q: You have been to the Hudson County Jail?
> A: Yes.
> Q: Do you have anything to do with their phone system?
> A: Do I? No, I don't have anything to do with their phone system.

Q: They told you it didn't work, they couldn't record calls?
A: Yeah. I inquired and they advised me they couldn't do that.
Q: Who was that?
A: It was a sergeant. I don't recall his name.

(T.T. at p.5471-72)

Petitioner fails to show that he is entitled to relief on this claim. He has not shown to a reasonable probability that the outcome of his trial would have been different had counsel objected. Petitioner has come forward with no evidence to suggest that the Hudson County Jail had the capabilities to record phone calls while he was there. This Court fails to see how if counsel had objected to this testimony, it would have changed the outcome of petitioner's trial to a reasonable probability.

L. Claim XII – Failure to meaningfully cross-examine important witnesses

In Claim XII, petitioner argues as follows:

> Trial counsel failed to use known and available documentary evidence to meaningfully cross-examine important fact witnesses on material matters relevant to all counts. Those witnesses include Agent Manson, Young, and Dock, and the documentary evidence that was known and available is certain grand jury transcripts, audio recordings, video recordings, and reports. Had counsel used the information that was known and available the jury would have had a fair basis to find a reasonable doubt with respect to Counts 1 and 2, and the drug charges as well.

(ECF 1 at p.8)

"[A] § 2255 movant cannot meet his burden of proving ineffective assistance of counsel based on vague and conclusory allegations[.]" *Stallworth v. United States*, No. 14-4005, 2018 WL 505073, at *4 n.4 (D.N.J. Jan. 19, 2018) (quoting *United States v. McClellan*, No. 16-2943, 2017 WL 2822315, at *1 (3d Cir. Jan. 3, 2017)). In this case, and specifically within Claim XII only, petitioner does not cite to anything specific with respect to the documentary evidence, grand jury transcripts, audio recordings, video records, and/or reports that trial counsel should

have specifically cross-examined these three witnesses on. Thus, this Court will not grant

petitioner relief on this particular vague and conclusory claim.

M. Claim XIII - Failure to properly preserve *Batson* issue

In Claim XIII, petitioner argues that trial counsel was ineffective when they failed to

preserve *Batson* objections during jury voir dire.

> The Equal Protection Clause forbids the use of peremptory strikes
> against potential jurors on the basis of race. *Batson* [v. *Kentucky*],
> 476 U.S. [79,] at 88–89, 106 S.Ct. 1712. *Batson* established a
> three-step process for determining the constitutionality of a
> peremptory strike. First, the defendant makes a prima facie case
> that the prosecutor exercised a peremptory challenge on the basis
> of race. *Coombs* [v. *Diguglielmo*], 616 F.3d [255,] 261 [(3d Cir.
> 2010)]. "Second, if the showing is made, the burden shifts to the
> prosecutor to present a race-neutral explanation for striking the
> juror in question." *Id.* (citing *Rice v. Collins,* 546 U.S. 333, 338,
> 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006)). "Third, the court must
> then determine whether the defendant has carried his burden of
> proving purposeful discrimination." *Id.* (quoting *Rice,* 546 U.S. at
> 338, 126 S. Ct. 969).

*Coombs v. DiGuglielmo*, 581 F. App'x 129, 132 (3d Cir. 2014). Within the *Strickland*

framework, petitioner "must show that his counsel's conduct during the *Batson* challenge fell

below the 'objective standard of reasonableness' by failing to live up to 'prevailing professional

norms.'" *Juniper v. Zook*, 117 F. Supp. 3d 780, 792 (E.D. Va. 2015) (citing *Padilla v. Kentucky*,

559 U.S. 356, 366 (2010) (quoting *Strickland*, 466 U.S. at 688)). In the context of the second

prong of *Strickland*, prejudice, a petitioner must show that the result of the *Batson* challenge

would have been different to a reasonable probability but for trial counsel's ineffectiveness. *See*

*id.*; *see also Pirela v. Horn*, 710 F. App'x 66, 82 n.16 (3d Cir. 2017) (noting that under *Weaver*

*v. Massachusetts*, 137 S. Ct. 1899, 1911 (2017), even if a petitioner's counsel's conduct led to a

structural error, "that term 'carries with it no talismanic significance' because Pirela cannot show

either a reasonable probability of a different outcome in his case, or that the error was 'so serious as to render his . . . . trial fundamentally unfair.").

At the outset, this Court notes that trial counsel did raise the issue of whether the prosecution was impermissibly striking jurors based on their race. Indeed, the following colloquy took place during voir dire:

> MR. HERMAN: We wanted to express a concern, Judge. By our count, there are five African American jurors in the first 52. The Government has struck three of them, juror number 31, juror number 108, juror number 72. Out of ---
> THE COURT: What are those numbers?
> MR. HERMAN: 31.
> THE COURT: What juror number?
> THE COURT: 35.
> MR. FRAZER: That's old 35?
> THE COURT: New 35.
> MR. HERMAN: Old 108.
> THE COURT: What's the new number? 56.
> MR. HERMAN: And 72.
> THE COURT: 47.
> MR. HERMAN: We're making a challenge under *Batson*, Judge, that of all the challenges, 12 challenges, they used three against African Americans with only five African Americans in the entire pool, Judge.
> MR. FRAZER: First, Judge, I don't think they made out a pattern under *Batson*, which is the threshold.
> THE COURT: I'm sorry?
> MR. FRAZER: They haven't made out a pattern under *Batson*, but regardless of that, Judge, for purposes of the record, we have exercised those challenges in a race-neutral fashion and I'll be happy to expound on that.
> THE COURT: Go ahead.
> MR. FRAZER: Number 31 clearly said she leans towards life imprisonment. That was the question the defense put, how do you lean one way or the other, even though you say you can be fair. She leans toward life imprisonment. We thought that she should have been challenged anyway. [¶] She also said – first of all, her child's father is in jail, so that's another reason that she may not be appropriate, she may harbor feelings about the criminal justice system. For those reasons, Judge, -- and she said it would be really hard to impose the death penalty. For those reasons, we challenged juror number 31. [¶] I'll need a minute to get to my notes.

MR. KAYSER: Can we have the old number?

MR. FRAZER: That was the old number, 31. [¶] Judge, by doing this we're not conceding in any way we've made a pattern under *Batson*, but for the record, we're just making these reasons known. [¶] The next one is – it may take a minute. This juror –

THE COURT: Who?

MR. FRAZER: 108, wrote on her questionnaire, "thou shalt not kill" is her religion and she agreed it. She "hates the idea of the death penalty." This is a quote. That's what she said both on the questionnaire and when I questioned her, she said that was the correct words. [¶] Her husband's brothers are both in jail for drug-related offenses and has been in jail off and on at various times for five years, one of them and one recently went in for a drug offense. [¶] She said as to that one, he was at the wrong place at the wrong time, so obviously that's questionable about whether she can – what her attitudes toward law enforcement might be. Those are the reasons for juror number 108, which I think are fairly obvious. [¶] Finally, 72, if I may just have a moment.

THE COURT: Which is new number 47.

MR. FRAZER: Oh, she was the Jamaican woman who was just all over the place and she had concerns over the death penalty that it may not – what happens if it's not the right person? She was easily confused, she went back and forth on numerous questions. [¶] Other than that, I'd have to pull my questionnaire, but I believe she also had a family member, husband's cousin in jail, but I would have to actually get the questionnaire, Judge. I have numerous notations that her questions on the questionnaire were, to say the least, questionable. I have seven of them listed. I'm just going to pull that for a moment. [¶] First, on the questionnaire, she failed to fill out her county and town of residence. She did not fill out the portions of the questionnaire which made it – it was unusual actually in relation to the rest of the pool. She, for instances, did not fill out her education in the questionnaire. She did not fill out anybody who influences her in her life and again, based upon – I remember her clearly, Judge. Her answers were equally kind of back and forth throughout the entire process. [¶] She also didn't fill out question 67, 68 regarding the defendant testifying and presumption of innocence. [¶] Overall, those were the reasons that the Government struck this juror. She also put a question mark under her religion, what her religion or spiritual affiliation was and what the teachings were. [¶] Those concerns caused us and those are all race-neutral reasons and legitimate reasons to challenge those jurors. [¶] Frankly, Judge, as we're doing this, Mr. Minish and I had no idea the race of the jurors. That's not written down on anything that we do, for the record.

THE COURT: All right. [¶] Well, the burdens involved in this issue require the opponent of the peremptory challenge to make out a prima facie case of discrimination. The burden then shifts to the proponent of the strike to come forward with a non-discriminatory explanation for the strike and then the Court determines whether or not the opponent of the strike has demonstrated purposeful discrimination as the intent for the exercise of the challenges. [¶] Having listened to the explanation put forth by Mr. Frazer, it does appear to me that the exercise of the challenges is based on non-racial reasons. He has articulated non-racial concerns as to each of the jurors who have been challenged and I have, therefore, concluded that the challenges will stand. [¶] I accept – I make the finding without the representation made by Mr. Frazer that they don't know the race of the jurors from the notes that they've kept and I certainly have no difficulty accepting the representation, but the Court's ruling on it doesn't require that representation because there has been a non-racial justification set forth for each of those challenges.

(T.T. at p.3203-08) After this discussion and decision by Judge Pisano, the use of peremptory strikes continued until petitioner's trial counsel made another *Batson* challenge after another prospective African-American juror was struck by the prosecution. Indeed, at that time, the following discussion took place:

MR. MINISH: Judge, the next two strikes from the Government are new number 33, which is old number 36; and new number 48, which is old number 74.
MR. HERMAN: Well, Judge, all I can do is keep count here. [¶] Old juror number 36.
THE COURT: 33 is already excused.
MR. HERMAN: I'm sorry, Judge. I'm making another *Batson* challenge. [¶] The Government has now struck the fourth black person.
THE COURT: 36?
MR. FRAZER: What number is that?
MR. HERMAN: Old number 36 is a black female, 43-year-old.
MR. FRAZER: That's old 347?
MR. HERMAN: No. The old number is 36.
MR. FRAZER: I'm sorry. Old 36, okay. [¶] One moment, Judge. [¶] Judge, I'm not sure counsel even is checking the notes, but again –
MR. HERMAN: I just want to make my record. I'm not looking – I'm simply reinforcing or remaking the *Batson* challenge that out

of five black people in the panel, the Government has now struck four.

MR. FRAZER: Very good. [¶] Her sister is in jail for a federal drug distribution. She first said it was state and then I questioned her because she mentioned the institution, which was a federal institution and so it was in New jersey, I believe, although I could be wrong on that. [¶] Right away, Judge, immediately that gave us cause because it's possibly our office or at least a United States Attorney's Office that put her sister in jail for a drug offense, the same as what's on trial here. It should be obvious, but I guess it's not. [¶] So, therefore, we immediately, when we heard that, though she said she could be fair, that's why we have peremptory challenges. We thought we would exercise one based upon that, which clearly could show a reason to harbor ill feelings toward both prosecutions and specifically federal prosecution and law enforcement in general. [¶] That was the main reason that we struck her. [¶] Judge, I mean, if – I can go back to the questionnaire and look at other reasons that we may have had. I don't know if the Court will permit me a minute, but since counsel is making the challenge, because despite her views on the death penalty, which I'm not clear what they are, but let me just go back to my notes. [¶] I don't think I have anything further to add as to her views on the death penalty at this time, Judge. That was the reason that we challenged that juror, which seems to be a very legitimate cause for concern for the prosecution.

THE COURT: All right. [¶] There's been a race-neutral explanation made for the challenge, which stands.

(T.T. at p.3209-11)

Petitioner's argument within this claim is not that his trial counsel failed to bring up the

*Batson* issue at trial. Indeed, as illustrated above, petitioner's trial counsel did in fact object to

assert that the government's peremptory strikes against four prospective African-American jurors

was unconstitutional. Instead, petitioner's argument is more nuanced. Petitioner asserts as

follows:

Trial counsel failed to effectively preserve the *Batson* objections. Specifically, counsel failed to challenge the pretextual nature of the government's race neutral explanations by making a comparison of the challenged black jurors vs. white jurors with similar traits as those claims by the prosecutor as the basis for the striking of black jurors.

42

(ECF 1-1 at p.9) According to petitioner, by not preserving the issue of the pretextual nature of the prosecutor's use of peremptory strikes against African-American prospective jurors, this caused the issue to be considered by the Third Circuit on appeal under a higher "plain error" standard than if trial counsel had challenged government's reasons for striking these four jurors as pretextual. (*See* ECF 29 at p.26-29).

The Third Circuit initially remanded the *Batson* issue back to the District Court after the government discovered voir dire notes it considered pertinent to the *Batson* issue. On remand, the District Court stated that "[b]ecause the prosecutor's voir dire notes were not available to the defense at the time of the *Batson* hearing, the Court shall consider the parties arguments that relate to the notes. However, the Court shall not reopen the *Batson* hearing in its entirety and shall not consider arguments that could have been raised originally but were not." (Crim. No. 03-836 ECF 287 at p. 9-10) In denying the *Batson* claim on remand, Judge Pisano held as follows:

> The defense offered no response to these reasons offered by the Government. The Court, moving to step three of the *Batson* analysis, found that the Government's "exercise of the challenges [was] based upon non-racial reasons" and allowed the strikes. By way of this Opinion, the Court now makes explicit what was implicit in the Court's ruling at that time. In overruling Baskerville's *Batson* objections, the Court found that the reasons offered by the Government for striking each of the black prospective jurors were credible and not pretexts for racial discrimination. The proffered reasons were the actual reasons for the Government's exercise of each of the challenged strikes. As was its burden, the defense simply did not show that the Government's exercise of any of the challenged strikes was racially-motivated.
>
> These findings of the Court were based upon several factors. At step three, "the critical question in determining whether a prisoner has proved purposeful discrimination ... is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller–El v. Cockrell,* 537 U.S. 322, 338–39, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The Supreme Court has noted that generally "the issue

43

comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible." *Id.* at 339. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Id.* Here, the reasons proffered by the Government were credible—they were reasonable, believable, probable and grounded in accepted trial strategy. The Court also found counsel for the Government to be credible and found no evidence of purposeful discrimination in counsel's demeanor. *See Snyder v. Louisiana,* 552 U.S. 472, 477, 128 S.Ct. 1203, 1208, 170 L.Ed.2d 175 (2008) ("Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.") (internal quotations and citations omitted; alteration in original).

With respect to credibility, the Court finds it appropriate to address AUSA's Frazer's statement in which he told the Court in response to the *Batson* challenge that "as we're doing this, Mr. Minish and I have no idea the race of the jurors" and "[t]hat's not written down on anything that we do, for the record." Tr. 3207:11–13. In light of the newly-produced voir dire notes, the defense now argues that here the Government attempted to mislead the Court. Baskerville alleges that AUSA Frazer's statement was "false" and "disingenuous," Def. Brf. at 1, 26, because the Government's jury selection notes show that the prosecutors did, in fact, have the race of prospective jurors written down.

Looking at the circumstances at the time the statement was made, the Court finds that AUSA Frazer's statement was not a deliberate attempt to mislead the Court. This conclusion rests not only on the Court's own observations of Mr. Frazer's demeanor at the time, but also on the context in which the statement was made. Indeed, at the time Mr. Frazer made that statement the Court and both of the parties were well aware that the prospective juror's race was, in fact, "written down" on at least some of the voir dire materials (*e.g.,* the questionnaires) and, therefore, AUSA Frazer's statement—as reflected in a cold transcript—was facially inaccurate and an apparent misstatement. Yet at that time it was made there was no argument from the defense that AUSA Frazer was attempting to mislead the Court, nor did the Court construe his statement in such a way.

To the extent that counsel's statement appears to be inconsistent with his or AUSA Minish's notes, the Court finds that counsel

simply misspoke, or, at worst, inarticulately stumbled in his attempt to convey his argument. Given its context, the Court recognized at the time Mr. Frazer made the statement that there was a possibility that he may have misspoken; therefore, the Court expressly noted that it did not rely upon counsel's representation in ruling on the *Batson* challenge. *See* Tr. 3208: 4–10 ("I make that finding without the representation by Mr. Frazer that they don't know the race of the jurors from the notes they've kept ..."). Nothing presented to the Court since that ruling in any way leads the Court to believe that any misstatement on the part of AUSA Frazer was deliberate.

At the *Batson* hearing, the Court found further support for its conclusion that the Government's stated reasons for exercising its strikes were credible and not pretexts for racial discrimination in the response—or lack thereof—of the defense. Defense counsel's silence[5] after the Government explained its reasons for the challenged strikes supported inferences that defense counsel was unaware of anything in the record that contradicted the reasons given, had no basis to challenge the prosecutor's justifications, and even that the defense may have conceded the objections. Indeed, Baskerville was represented by extremely capable counsel, experienced in death penalty cases, who certainly would have been well aware that Baskerville bore the burden to establish that the Government's strikes were racially motivated. *See Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) ( "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."); *Rice v. Collins,* 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (same); *Johnson v. California,* 545 U.S. 162, 170–71, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) (*"Batson* ... explicitly stated that the defendant ultimately carries the burden of persuasion to prove the existence of purposeful discrimination.") (quotations omitted); *Bond v. Beard,* 539 F.3d 256, 264 (3d Cir.2008) ("The burden at this step three is to show that it is more likely than not that the prosecutor struck at least one juror because of race.") (citing *Wilson v. Beard,* 426 F.3d 653, 670 (3d Cir.2005). If counsel had reason to believe the reasons offered by the Government were pretextual, surely the defense would have spoken up. Notably, Baskerville does not assert that he was in any way denied the opportunity to present further argument and evidence regarding pretext.

Lastly, the Court turns to the parties remaining arguments regarding the prosecutor's voir dire notes. Baskerville argues that evidence of purposeful racial discrimination is found in the fact

that these notes contained references to "constitutionally-protected characteristics, including race and gender," Def. Br. at 5, and that the prosecutors ranked and/or graded the desirability of the potential jurors "based upon characteristics and comments recorded in their notes, which included the jurors' race and gender," Def. Br. at 26. Having reviewed the prosecutor's notes in their entirety, the Court finds in them no basis to disturb the Court's conclusion that there was no *Batson* violation here.

First, the Court finds nothing improper, as a general matter, about the fact that the prosecution's notes contained notations regarding race in this case. The fact that the Government's lawyers made notations regarding identifying characteristics such as race is hardly surprising in a post-*Batson* matter and, particularly, in light of the large number of potential jurors in this case as well as the extended period of time it took to select a jury. Indeed, both parties, not just the Government, believed race was relevant enough to the jury selection process to include it on the juror questionnaire.

Further, as the notes show and the Government has explained, the prosecution used a grading system for the final selection of jurors. Prospective jurors were ultimately assigned "E" for excellent; "VG" for very good; "G" for good; and "S" for strike. In exercising their strikes, the record shows that the Government first struck those prospective jurors with the lowest grades, then moved up to the higher graded prospective jurors. Contrary to the assertion of the defendant, there is no evidence race played any part in the determination of a potential juror's grade. Nor does the Court find that the grades assigned to the jurors were in some way a proxy for race. Indeed, black prospective jurors in the pool were given grades across the entire spectrum. Prior to the final reshuffling of the approximately 80 prospective jurors (and, thus, not knowing the order in which the jurors would end up), the Government graded each of the jurors. Of the six black prospective jurors (only five of which ended up in the pool of 52), three were graded "strike", one was graded "good", one was graded "very good" and one was graded "excellent."

The manner in which the strikes were exercised-in particular, the fact that the prosecution consistently struck jurors within a given grade before striking jurors with a higher grade—further supports the conclusion that race was not the basis for any of the Government's challenged strikes. Indeed, when exercising their strikes, the government first struck jurors that were graded "strike," then the jurors graded "good." Moving then to those rated "very good," for its final two strikes, the Court takes particular

> note of the fact that the Government struck two white prospective
> jurors (Jurors 14/331 and 45/120) while a black prospective juror
> (17/342) with the same "very good" rating was not stricken.
> In sum, having considered the parties arguments with respect to the
> prosecution's voir dire notes, the Court finds that the defense has
> not carried its burden to show purposeful racial discrimination on
> the part of the Government.

*United States v. Baskerville*, Crim. No. 03-836, 2011 WL 159782, at *6–9 (D.N.J. Jan. 18,

2011), *aff'd*, 448 F. App'x 243.

On appeal, the Third Circuit reviewed petitioner's *Batson* claim for plain error because

petitioner's defense counsel "sat silent after the Government stated its reasons for exercising

peremptory challenges to which defense counsel objected." *Id.* at 247. Under this standard, the

Third Circuit examined the claim to determine whether: (1) there was error; (2) that was plain or

obvious; and (3) that affects a defendant's substantial rights. *See United States v. Ferguson*, 876

F.3d 512, 514 (3d Cir. 2017) (citing *United States v. Goodson*, 544 F.3d 529, 539 (3d Cir. 2008)

(citing *Johnson v. United States*, 520 U.S. 461, 467 (1997)). The Third Circuit began its analysis

on petitioner's *Batson* claim as follows:

> We fail to find any error, let alone plain error, that would lead us to
> disturb the District Court's ruling that the prosecutor's race-neutral
> reasons were credible. To start, the District Court did not plainly
> err by failing to compare jurors *sua sponte* before deeming the
> prosecution's race-neutral explanations credible. The third step in
> the *Batson* analysis calls upon the District Court to determine
> "whether the opponent of the strike has *proved* purposeful racial
> discrimination." *Purkett,* 514 U.S. at 767, 115 S.Ct. 1769
> (emphasis added). The *Batson* framework, then, squarely places
> the ultimate burden of persuasion on the challenger, not the
> District Court. *See Hardcastle,* 368 F.3d at 258. This is not to
> suggest that the challenger necessarily must rebut the prosecution's
> race-neutral reasons to succeed on a *Batson* claim. Rather, it is an
> acknowledgement that the challenger risks not satisfying his
> burden of proving discriminatory intent if the court reasonably
> concludes that the reasons, in and of themselves, are credible and
> not pretextual. *See, e.g., United States v. Rodriguez,* 178 F. App'x
> 152, 156–57 (3d Cir. 2006) (finding no error in the denial of

defendant's *Batson* objection where she failed to challenge the Government's race-neutral reasons and therefore could not satisfy her burden).

Here, the District Court did find the reasons proffered to be credible and not pretextual. *Had the defense raised a challenge based on comparisons to similar white jurors whom the Government did not challenge and lack of support in the record for the explanations offered by the Government, perhaps the District Court would have inquired and investigated further, and made a different ruling.* But the defense made no such argument. Accordingly, the District Court's failure to scour the record of over six weeks' worth of jury selection on its own for evidence of discriminatory intent unassisted by Baskerville did not constitute plain error. [FN 3] The error about which Baskerville complains with respect to the District Court's analysis is, instead, attributable to his own failure to point out weaknesses in the proffered reasons when the opportunity arose.

> [FN 3] "Comparative analysis is one of many tools that a court may employ to determine whether the government exercised its peremptory challenges for discriminatory purpose. Trial courts, however, are not required to conduct such an analysis." *United States v. You*, 382 F.3d 958, 969 (9th Cir. 2004).

*Baskerville*, 448 F. App'x at 247–48 (emphasis added). Petitioner seizes upon the emphasized language from the Third Circuit cited above to support his ineffective assistance of counsel claim for failing to argue that the government's reasons were pretextual. However, the Third Circuit did not stop its analysis on petitioner's *Batson* claim there. Instead, the Third Circuit also considered petitioner's argument of comparing the stricken African-American potential jurors to similar potential white jurors who were not struck by the government. Indeed, the Third Circuit stated as follows on petitioner's direct appeal:

> Moreover, we do not find the points of comparison between jurors that Baskerville urges to be so blatant that the District Court should have easily recognized that the Government's reasons lacked credibility. *There are significant differences, aside from their race, between the white jurors with whom Baskerville would have us compare the challenged black jurors that justify their differential*

*treatment.* For example, the prosecution struck Juror 47/72 not solely because of her attitudes toward the death penalty, which Baskerville argues were similar to those of several white jurors. Rather, the prosecution also explained that Juror 47/72 failed to answer critical parts of the juror questionnaire, a non-issue with respect to the purportedly similar white jurors. Furthermore, the prosecution struck Juror 33/36 because his sister was serving a federal drug sentence not unlike that which Baskerville himself faced. The white juror to whom Baskerville compares Juror 33/36, however, had relatives who only served state sentences for crimes less like Baskerville's in their nature and severity. *The record is replete with examples like these, which satisfy us that the prosecution's reasons were not obviously pretextual and that, in any event, the District Court did not plainly err in concluding that Baskerville had not proven discriminatory intent.*

Baskerville's portrayal of the prosecution's race-neutral reasons as either mischaracterizations of the record or simply untrue does not lead us to reconsider. First, the misstatements which Baskerville believes show the prosecution's insincerity were immaterial to the overriding reasons offered in support of its peremptory strikes. Second, and more importantly, the relevant question at the third step of the *Batson* inquiry is the "honesty—not the accuracy—of a proffered race-neutral explanation." *United States v. Yarrington,* 640 F.3d 772, 779 (7th Cir.2011) (internal quotation marks omitted). As a result, the District Court's findings are generally afforded considerable deference. *See Batson,* 476 U.S. at 98 n. 21, 106 S. Ct. 1712 ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference."). Here, the District Court explicitly deemed the explanations credible after observing first-hand the prosecutor's demeanor and other relevant factors. We fail to see how a few minor inaccuracies in those explanations render its finding somehow plainly erroneous.

The voir dire notes produced by the Government do not demonstrate otherwise. We agree with the District Court's consideration of the notes' effect, or lack thereof, on the *Batson* analysis. Merely making notes of a juror's race, as the prosecution did, is insufficient alone to support a finding of discriminatory intent. Similarly, the grading system used by the prosecutors, without more, does not lead us to conclude that the Government intentionally discriminated.

*Baskerville*, 448 F. App'x at 248–49 (emphasis added).

As stated above, the Third Circuit expressly stated that there were significant differences aside from race with respect to the jurors that petitioner seeks to have compared to the African-American jurors who were struck. Petitioner comes forward with nothing new in this § 2255 proceeding to contest or challenge that finding by the Third Circuit on his direct appeal. Thus, applying *Strickland* to this *Batson* claim as this Court must, this Court finds that petitioner has failed to show to a reasonable probability that the outcome of his *Batson* challenges would have been different had trial counsel argued pretext at trial. Given the Third Circuit's express statements that there were significant differences in the juror comparisons, coupled only with petitioner's bald and conclusory statement that the result of his proceeding would have been different, this Court finds that petitioner fails to show that he is entitled to an evidentiary hearing and/or relief on this claim. Accordingly, it will be denied.

N. Claim XIV – Failure to challenge grand jury irregularities

In Claim XIV, petitioner asserts that:

> There was information of false/misrepresented manner put before the grand jury via Dock's testimony. That irregularity was not cured by the verdicts at trial since the irregularity in the grand jury process was not aired at trial. Trial counsel failed to seek any redress with regard to the compromised integrity of the grand jury process based on Dock's false testimony before that body.

(ECF 1 at p.8)

Petitioner does not indicate in his petition or reply what part of Dock's grand jury testimony he is challenging that is false. As such, this claim is conclusory and does not warrant granting petitioner relief.

O. Claim XV – Failure to challenge ex parte application and order re: discovery

In Claim XV, petitioner argues that:

> Trial counsel was aware that discovery was being delayed and that
> other restrictions were placed on defendant-movant's access to
> information relevant to this case. The delays and restrictions with
> respect to discovery made it impossible for defendant-movant to
> defend himself in a fair and meaningful manner as he was entitled.
> Nevertheless, trial counsel failed to make any challenge with
> regard to the obstructive nature of the delays and restrictions
> relevant to discovery . . . . [D]efendant-movant was stripped of
> any ability to offer timely insight on relevant matters. Thus, trial
> counsel's failure to challenge the discovery delays/restrictions was
> plainly unreasonable.

(ECF 1 at p.8)

Petitioner does not allege with any specificity what discovery was delayed and restricted within this particular and specific claim. As such, this claim is conclusory and does not warrant granting him relief.[9]

P.  Claim XVI – Failure to Object to Court's Jury Instruction that Relieved Government of
    Burden of Proof on Counts 1 and 2

In Claim XVI, petitioner states that the trial court instructed the jury on the charge of conspiracy to murder a witness with premeditation. However, according to petitioner, the indictment charged him with conspiracy and agreeing with others to kill McCray with malice aforethought. Petitioner claims that by trial counsel failing to object to the jury instructions because they did not discuss malice aforethought, it relieved the government of its burden to prove the offense elements of the indictment, i.e. malice aforethought. (ECF 1 at p.9)

Contrary to petitioner's argument, the trial court did instruct the jury on malice aforethought. Indeed, the jury was instructed in part as follows;

> The indictment charges that the unlawful killing was a
> "premeditated murder" as defined in another section of the
> criminal code, Section 1111, which states in relevant part,
> "premeditated murder is the unlawful killing of a human being

---

[9] In other claims, petitioner is specific. For those claims, this court will address them individually in this Opinion.

with *malice aforethought*. Every murder perpetrated by poison, lying in wait or any other kind of willful, deliberate, malicious and premeditated killing is murder in the first degree."

As used in these instructions, the term "*malice aforethought*," means an intent at the time of a killing, willfully to take the life of a human being or an intent to willfully act in callous and wanton disregard of the consequences to human life, but *malice aforethought* does not necessarily imply any ill will, spite or hatred toward the individual killed.

In determining whether Mr. McCray was unlawfully killed with *malice aforethought*, you should consider all of the evidence concerning the facts and circumstances preceding, surrounding and following the killing which tend to shed light upon the question of intent.

A killing is premeditated when it is intentional and the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of his intent and to have thought about the killing. For there to be premeditation, the killer must think about the taking of human life before acting.

The amount of time required for premeditation cannot be arbitrarily fixed. The time required varies as the minds and temperament of people differ and according to the surrounding circumstances in which they may be placed. Any interval of time between forming the intent to kill and acting on that intent which is long enough for the killer to be fully conscious and mindful of what he intended and willfully set about to do is sufficient to justify the finding of premeditation.

(T.T. at p.5634-35 (emphasis added)) As the above cited portion of the instructions to the jury indicates, the trial court did instruct the jury on malice aforethought. Thus, Petitioner is factually incorrect that the jury was not so instructed. Accordingly, he is not entitled to relief on this claim.

Q. Claim XVII – Failure to Object/Preserve Constructive Amendment of Indictment

In Claim XVII, petitioner asserts that the trial court constructively amended the indictment on Count 1 by instructing the jury in a manner that permitted it to convict him on

non-applicable offenses not applicable. The fourth superseding indictment charged petitioner as

follows with respect to count one;

> William Baskerville, a/k/a "Cheeb," did knowingly and willfully
> conspire and agree with others to kill another person, namely,
> KDM, with malice aforethought and with intent to prevent the
> attendance and testimony of KDM in an official proceeding, which
> killing is a murder as defined in Title 18, United States Code,
> Section 1111(a), in that in furtherance of the conspiracy a co-
> conspirator did unlawfully kill KDM willfully, deliberately,
> maliciously, and with premeditation, contrary to Title 18, United
> States Code, Sections 1512(a)(1)(A) and (a)(3)(A).

(Crim. No. 03-836 ECF 82 at p.3) It appears as if petitioner is asserting an argument in this claim

based on similar arguments he made in Claim XVI, namely a failure to instruct the jury on

malice aforethought.

As explained by the Third Circuit:

> An indictment is constructively amended when evidence,
> arguments, or the district court's jury instructions effectively
> "amend[s] the indictment by broadening the possible bases for
> conviction from that which appeared in the indictment." *United
> States v. Lee,* 359 F.3d 194, 208 (3d Cir. 2004). We have held that
> a constructive amendment is an exceptional category of error
> because it violates a basic right of criminal defendants, the grand
> jury guarantee of the Fifth Amendment. *United States v. Syme,* 276
> F.3d 131, 154 (3d Cir. 2002) (applying *United States v. Adams,*
> 252 F.3d 276 (3d Cir. 2001)). "A constructive amendment to the
> indictment constitutes 'a *per se* violation of the fifth amendment's
> grand jury clause.'" *Id.* at 148 (quoting *United States v. Castro,*
> 776 F.2d 1118, 1121-22 (3d Cir. 1985)). A constructive
> amendment of the charges against a defendant deprives the
> defendant of his/her "substantial right to be tried only on charges
> presented in an indictment returned by a grand jury." *United States
> v. Syme,* 276 F.3d 131, 149 (3d Cir. 2002) (citation omitted). Thus,
> where a trial court constructively amends a jury instruction, our
> plain error analysis presumes prejudice. *Id.*

*United States v. McKee,* 506 F.3d 225, 229 (3d Cir. 2007) (footnote omitted).

Contrary to petitioner's arguments, the jury instructions did not constructively amend the indictment. Indeed, as explained above, the jury was instructed on malice aforethought. Therefore, petitioner is not entitled to relief on this claim.

R. Claim XVIII – Failure to Object/Preserve Issue of Insufficient Definition of Conspiracy

In Claim XVIII, petitioner argues that the jury instructions did not sufficiently define what was required to be convicted beyond a reasonable doubt on Counts 1 and 2. Accordingly, he asserts that trial counsel was ineffective for failing to object and preserve this issue. Judge Pisano instructed the jury as follows with respect to Count 1 and 2 at trial:

> Count one of the indictment charges the defendant with a conspiracy to murder a witness with premeditation. You will see in reading the indictment, I won't read it in its entirety because it's four pages long, but you will see that the charge set forth in the indictment is conspiracy to murder a witness with premeditation. Now, you've heard about statutes and federal and federal laws of criminal violations and things. Going back to your civics in high school, you remember that laws are passed and Congress passes bills, the president signs legislation and it becomes federal law. There's a Criminal Code of federal law which constitutes all of the crimes that have been determined to be illegal conduct and has the force of federal law.
>
> There are a lot of them, but as relevant to this case, one of them is alleged in what we call Section 1512 of Title 18 of the United States Code. "Whoever conspires to commit any offense is guilty of a crime against the United States." That's why I say that a conspiracy is, in and of itself, a crime.
>
> With respect to this particular charge, conspiracy to murder a witness or tamper with a witness, the Government has to establish two elements. *They must be established beyond reasonable doubt.* First, the Government must establish that there was a conspiracy to murder Kemo DeShawn McCray with premeditation and with the intent to prevent Kemo DeShawn McCray's attendance or testimony at an official proceeding; that there was a conspiracy to murder him with premeditation and with the intent to prohibit and prevent him from attending or testifying at an official proceeding. It is alleged and must be proven that the conspiracy was formed, reached, entered into by two or more persons.

The second element is that at sometime during the existence or life of the conspiracy, the defendant knew the purpose of the agreement and then willfully joined the conspiracy.

If you find from the evidence in the case that the conspiracy charged in count one of the indictment existed, and during its lifetime the defendant became a member, then proof of the conspiracy is complete and you may find him guilty of that conspiracy that is charged.

Now, I have instructed you on the general standards for use in determining whether a conspiracy to pursue a common, unlawful object existed. I'm now going to discuss the alleged objective of the conspiracy charged in count one in this indictment.

The Government must prove beyond a reasonable doubt that the object of the conspiracy charged in count one was to murder Kemo DeShawn McCray with premeditation, with the intent to prevent the testimony of Mr. McCray at an official proceeding. The object crime of the conspiracy charged in count one, tampering with a witness, is defined in Section 1512A(1)(a) of Title 18 of the United States Code and that statute provides, "Whoever kills another person with the intent to prevent the attendance or testimony of any person in and official proceeding is guilty of the crime against the United States."

The elements of the object crime of the conspiracy charged in count one are these: First, that the defendant murdered Kemo DeShawn McCray with premeditation; second, that the murder of Kemo DeShawn McCray was perpetrated with the intent to prevent the attendance or testimony of Kemo DeShawn McCray at an official proceeding.

Let me rephrase that. The first element, I told you that it must be prove that the defendant murdered Kemo DeShawn McCray. That's actually not correct. It must be demonstrated, the object crime is that there was a premeditated murder of Kemo DeShawn McCray.

The second element, that the murder was perpetrated with the intent to prevent the attendance at an official proceeding. Remember, this is the object crime, the conspiracy is the crime charged against the defendant.

Now, you need not find that the conspirators committed the object crime, tampering with a witness, or that the elements of tampering with a witness have been proven. In determining whether the defendant is guilty of the conspiracy charged in count one, keep in mind that the conspiracy to tamper with a witness is separate and distinct from the crime of actually tampering with the witness. Accordingly, it is not necessary that the defendant actually succeeded in tampering with a witness or put differently, the evidence need not show that the members of the alleged conspiracy were successful in achieving any or all of the objects or goals of the agreement.

All you need to find is that there was an agreement, understanding or plan to tamper with a witness. Some of these terms require definitions and these definitions will apply throughout this charge, so I'm not going to repeat these definitions, mercifully.

The indictment charges that the unlawful killing was a "premeditated murder" as defined in another section of the criminal code, Section 1111, which states in relevant part, "premeditated murder is the unlawful killing of a human being with *malice aforethought*. Every murder perpetrated by poison, lying in wait or any other kind of willful, deliberate, malicious and premeditated killing is murder in the first degree."

As used in these instructions, the term "*malice aforethought*," means an intent at the time of a killing, willfully to take the life of a human being or an intent to willfully act in callous and wanton disregard of the consequences to human life, but *malice aforethought* does not necessarily imply any ill will, spite or hatred toward the individual killed.

In determining whether Mr. McCray was unlawfully killed with *malice aforethought*, you should consider all of the evidence concerning the facts and circumstances preceding, surrounding and following the killing which tend to shed light upon the question of intent.

A killing is premeditated when it is intentional and the result of planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It must be long enough for the killer, after forming the intent to kill, to be fully conscious of his intent and to have thought about the killing. For there to be premeditation, the killer must think about the taking of human life before acting.

The amount of time required for premeditation cannot be arbitrarily fixed. The time required varies as the minds and temperament of people differ and according to the surrounding circumstances in which they may be placed. Any interval of time between forming the intent to kill and acting on that intent which is long enough for the killer to be fully conscious and mindful of what he intended and willfully set about to do is sufficient to justify the finding of premeditation.

"Intent" was previously defined. You may find such intent from all the facts and circumstances surrounding the case. "Willfully" has also been previously been defined and you may consider all the facts and circumstances surrounding the case to determine whether conduct was willful.

The term "official proceeding" means a proceeding before a Judge or Court of the United States, United States Magistrate Judge or a federal Grand Jury.

Conspirators need not know that the proceeding was a federal proceeding. Further, it is not necessary that a proceeding actually depending on testimony was about to be instituted. It is not necessary that the victim be under subpoena or a scheduled witness in a case.

The statute purposefully use the term "person" instead of witness. I instruct you that a federal criminal trial such as this, is an official proceeding under the meaning of the statute.

Count two of the indictment alleges a conspiracy to retaliate against an informant. Again, remember that the crime charged against the defendant is a conspiracy to retaliate against Mr. McCray, who was a federal informant.

This also has certain elements that I'm going to instruct you about. *In order to prove defendant guilty of count two of the indictment, the Government must prove each of the following elements beyond a reasonable doubt*: First, that a conspiracy to murder Kemo DeShawn McCray with premeditation and intent to retaliate against Mr. McCray for providing to law enforcement officers any information relating to the commission of a possible or possible commission of a federal offense was formed, reached or entered into by two or more persons. The first element is the Government must establish the existence of a conspiracy to murder Mr. McCray with premeditation in order to retaliate against him for providing information to law enforcement.

The second element is that at sometime during the existence of the life of the conspiracy, the defendant knew the purpose of the agreement or conspiracy and then willfully joined it.

If you find from the evidence in this case that the conspiracy charged in count two of the indictment existed, and that during its lifetime the defendant became a member of it, then proof of the conspiracy is complete and you may find him guilty of that crime charged.

Object of that conspiracy. I previously instructed you on general standards for use in determining whether a conspiracy to pursue a common, unlawful object existed and I'm going to discuss the alleged objective crime as to the conspiracy charged in count two of the indictment. *Again, the government must prove beyond reasonable doubt that the object of the conspiracy charged in count two was to murder Kemo DeShawn McCray with premeditation, with the intent to retaliate against him for providing to a law enforcement officer information relating to the commission or possible commission of a federal crime.*

The object crime in the count two conspiracy, retaliating against an informant, is defined in another section of the code, Section 1513A(1)(b), which provides, "whoever kills another person with intent to retaliate against any person for providing to a law enforcement officer any information relating to the commission or possible commission of a federal offense is guilty of a crime against the United States."

The elements of the object crime in the count two conspiracy are these: First, that the killing of Kemo DeShawn McCray was done with premeditation; and second, that the killing was done with the intent to retaliate against Kemo DeShawn McCray for providing to a law enforcement officer any information relating to the commission or possible commission of a federal offense.

You need not find the conspirators committed the object crime or that the elements of retaliating against an informant have bene proven in determining whether the defendant is guilty. Keep in mind that the crime of conspiracy to retaliate against an informant is separate and distinct from the crime of actually retaliating against an informant and accordingly, it is not necessary that the defendant actually succeeded in retaliating against an informant.

Put differently, the evidence need not show that the members of the conspiracy were successful in achieving any or all of the

objects or goals. All that you need to find is that there was an agreement, understanding or plan to retaliate against an informant. I have previously defined premeditated murder. I've previously defined malice aforethought, premeditation, intent, willfully and you should apply the definitions to those phrases that I've given you.

The term "law enforcement officer" means an officer or employee of the federal Government authorized to prevent, investigate or prosecute offenses or serving as a probation officer and I instruct you that a special agent of the Federal Bureau of Investigation is a law enforcement officer.

(T.T. at p.5631-39 (emphasis added))

A faulty jury instruction rises to the level of a due process violation where the ailing instruction so infected the entire trial that the resulting conviction violates due process. *See Middleton v. McNeil,* 541 U.S. 433, 437 (2004); *Estelle,* 502 U.S. at 71–72. The instruction must be more than merely erroneous as petitioner must show that there was a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Middleton,* 541 U.S. at 437. The instruction must not be judged in artificial isolation, "but must be considered in the context of the instructions as a whole and the trial record." *Estelle,* 502 U.S. at 72.

In this case, petitioner is proceeding on this claim as an ineffective assistance of counsel claim. Thus, petitioner must also show that counsel's performance was deficient and that he was prejudiced by counsel's failure to object to the jury instruction. *See Lusick v. Palakovich,* 270 F. App'x 108, 110 (3d Cir. 2008).

Petitioner fails to show that he was prejudiced by counsel's failure to object to the trial court's instructions with respect to count one and two. Contrary to petitioner's assertions in this claim, and as the emphasized portion of the jury instructions quoted above indicates, the jury was specifically instructed that the Government needed to prove the elements of counts one and two

beyond a reasonable doubt. Earlier on in the jury instructions, Judge Pisano explained to the jury

the reasonable doubt standard as follows:

> Although the Government is required to prove the defendant
> beyond a reasonable doubt, the Government is not require to
> present all possible evidence related to the case or to produce all
> possible witnesses who might have some knowledge about the
> facts of this case.
>
> In addition, as I have explained, and will explain again, the
> defendant is not required to present any evidence or to produce any
> witnesses at all.
>
> Now, we'll talk about the burden of proof and the presumption of
> innocence. As I have explained to you a couple of times, the
> defendant, William Baskerville, has pled not guilty to all of the
> charges in this case. Mr. Baskerville is presumed to be innocent.
> He started the trial with a clean slate, with no evidence against
> him. The presumption of innocence stays with a defendant unless
> and until the Government has presented evidence that overcomes
> that presumption by convincing you that the defendant is guilty
> beyond a reasonable doubt.
>
> The presumption of innocence requires that you find the defendant
> not guilty unless you are satisfied that the Government has proved
> his guilty beyond a reasonable doubt. The presumption of
> innocence means that the defendant has no burden or obligation to
> present any evidence at all or to prove that he is not guilty. The
> burden or obligation of proof is on the Government to prove that
> the defendant is guilty and this burden stays with the Government
> throughout the trial.
>
> *In order for you to find the defendant guilty of the offenses charged
> or any of them, the Government must convince you that the
> defendant is guilty beyond a reasonable doubt. That means that the
> Government must prove each and every element of the offenses
> charged beyond a reasonable doubt.*

(T.T. at p.5606-07 (emphasis added))

As these instructions make clear, the jury was instructed on the reasonable doubt

standard, and that the government had to prove all of the elements of an offense beyond a

reasonable doubt. The jury is presumed to have followed these instructions. *See Weeks v.*

*Angelone*, 528 U.S. 225, 234 (2000). Accordingly, petitioner fails to show that counsel was ineffective for failing to object these instructions. Therefore, he is not entitled to relief on this claim.

S.  Claim XIX – Failure to Seek Bifurcated Trial

In Claim XIX, petitioner argues that trial counsel was ineffective when he failed to seek bifurcated trials. Petitioner asserts that the murder related counts (count one and two) should have been separated from the remaining drug counts.

Federal Rule of Criminal Procedure 8(a) states that:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged – whether felonies or misdemeanors or both – are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a). As one court has explained:

> a variety of courts have sanctioned joinder of underlying substantive charges with additional charges arising out of post-charge or post-investigation conduct calculated to hinder prosecution or escape liability on the original charges. *See United States v. Carnes,* 309 F.3d 950, 957-58 (6th Cir. 2002) (holding joinder of witness tampering count with underlying felon in possession charge was proper); *United States v. Balzano,* 916 F.2d 1273, 1280 (7th Cir. 1990) (holding joinder of witness intimidation count with conspiracy and extortion counts was proper because intimidation amounted to attempt to cover-up or escape liability for underlying offenses and, thus, "was clearly part and parcel of the same criminal scheme"); *United States v. Chagra,* 754 F.2d 1186, 1188 (5th Cir. 1985) (holding counts alleging obstruction of justice and possession with intent to distribute marijuana were properly joined with conspiracy and murder counts where former acts were committed for purpose of avoiding punishment for latter); *United States v. Davis,* 752 F.2d 963, 972 (5th Cir. 1985) (joinder of obstruction of justice count with underlying mail fraud and false statements counts proper where evidence of fraud tended to establish motive for obstruction of justice and, similarly, evidence of obstruction (*i.e.,* failure to produce subpoenaed documents, alleged interference with witness) tends to establish defendant's

> guilty consciousness of underlying substantive offenses); *see also*
> *United States v. Kaler,* 2001 WL 303349, at *2 (6th Cir. March 20,
> 2001) (unpublished opinion) (holding escape or failure to appear
> charge and underlying offense are "connected together" and
> properly joined under Rule 8(a) if charges are related in time,
> motive for flight was avoidance of prosecution of the underlying
> offense, and custody derived directly from the underlying
> offense).

*United States v. Cartwright*, No. 1:04-CR-33, 2005 WL 1118039, at *2 (E.D. Tenn. Apr. 28,

2005).

In this case, the conspiracy to murder a witness (count one) and the conspiracy to retaliate

against a witness (count two), were charges arising out of post-charged conduct calculated to

hinder prosecution of or escape liability on the drug charges against petitioner. As such, the

charges were part of the same "common scheme." *See Chagra*, 754 F.2d at 188 ("An indictment

states a common scheme under Rule 8(a) when it alleges that a defendant has attempted to

escape liability for one criminal offense through the commission of others.") (footnote omitted).

Additionally, Federal Rule of Criminal Procedure 14(a) permits severance "if the joinder

of offenses . . . in an indictment, an information or a consolidation for trial appears or prejudice a

defendant[.]" Fed. R. Crim. P. 14(a).

> To prevail on a severance claim, a defendant must "pinpoint clear
> and substantial prejudice resulting in an unfair trial." *Id.* (quoting
> *United States v. McGlory,* 968 F.2d 309, 340 (3d Cir.1992)). This
> requires more than showing "severance would have increased the
> defendant's chances of acquittal." *McGlory,* 968 F.2d at 340.
> Rather, "the question of prejudice hinges upon 'whether the jury
> will be able to compartmentalize the evidence as it relates to
> separate defendants in view of its volume and limited
> admissibility.' " *Walker,* 657 F.3d at 170 (quoting *United States v.*
> *Davis,* 397 F.3d 173, 182 (3d Cir.2005)). Because juries are
> presumed to follow instructions, jury instructions are "persuasive
> evidence that refusals to sever did not prejudice the defendant[ ]."
> *Id.* at 171 (citing *United States v. Lore,* 430 F.3d 190, 206 (3d
> Cir.2005)).

*United States v. Green*, 563 F. App'x 913, 917 (3d Cir. 2014).

Petitioner has come forward with nothing more than conjecture to show that the jury was unable to compartmentalize the evidence with respect to the different counts. The jury was specifically instructed that they were to consider each count separately and return a separate verdict of guilty or not guilty for each count. Indeed, Judge Pisano instructed the jury as follows:

> Now, in this case, the defendant is charged with several offenses. Each offense is charged in what we call a separate count of the indictment. The number of offenses charged is not evidence of his guilt and this should not influence your decision in any way. You must separately consider the evidence that relates to each of the offenses. For each offense charged, you must decide whether the Government has proved beyond reasonable doubt that the defendant is guilty of that particular offense.
>
> Your decision on one offense or one count, whether guilty or not guilty should not influence your decision on any of the other counts charged. Each offense or count must be considered separately.

(T.T. at p.5609). The jury is presumed to have followed these instructions. *See Weeks*, 528 U.S. at 234.

Given that there was no indication that the jury was unable to compartmentalize the evidence, coupled with the fact that the jury was given a proper limiting instruction, petitioner fails to show that he was prejudiced by counsel not seeking to sever the murder and drug counts at trial. Accordingly, petitioner fails to show that he is entitled to relief on this claim. Counsel's conduct is not considered to be ineffective for failing to raise a meritless issue.

Furthermore, even if counsel should have raised the severance issue, petitioner has not shown to a reasonable probability that the outcome of his proceeding would have been different, particularly where counts one and two arose out of petitioner's conduct to escape liability on his drug charges. Thus, any motion to sever presumably would have been denied. *See United States v. Johnson*, Crim. No. 08-285, 2014 WL 3953153, at *4 (W.D. Pa. Aug. 12, 2014) (petitioner

fails to show prejudice arising from failure to file sever motion because he is unlikely to have prevailed under such a motion). Therefore, petitioner is not entitled to relief on this claim.

T. Claim XX – Failure to Object to Illegal Sentence

In Claim XX, petitioner claims that the government sought enhanced penalties with respect to the drug counts pursuant to an information filed under 21 U.S.C. § 851. However, petitioner states that the sentencing court did not address him personally to determine whether or not he affirmed or denied that he had previously been convicted for two prior drug felonies as alleged by the government. Additionally, petitioner challenges the mandatory life sentences with respect to counts 4-9 (the drug counts) as lacking any justification. He claims counsel failed to challenge these errors by the sentencing court.

Prior to trial, the government filed an enhanced penalty information that listed petitioner's two prior felony drug convictions. (*See* Crim. No. 03-836 ECF 112) The jury had already found in the penalty phase that the government had established beyond a reasonable doubt that petitioner had previously been convicted of "2 or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance." (Crim. No. 03-836 ECF 224 & 225)

Given this as a background, trial counsel stated that they did not want to object to the validity of these findings at the sentencing hearing. Counsel's actions in failing to object did not fall below an objective standard of reasonableness.

Additionally, as stated above, petitioner also challenges counsel's failure to object to his mandatory life terms on counts 4-9 (distribution of cocaine base). However, petitioner's murder convictions carried a mandatory life term. His drug convictions were ordered to run concurrently to his murder convictions.

As a panel of the Third Circuit has explained:

> Under the concurrent sentence doctrine, a court has "discretion to
> avoid resolution of legal issues affecting less than all counts in an
> indictment if at least one will survive and sentences on all counts
> are concurrent." *United States v. McKie,* 112 F.3d 626, 628 n. 4
> (3d Cir.1997); *United States v. American Investors of Pittsburgh,
> Inc.,* 879 F.2d 1087, 1100 (3d Cir.1989) (citing *United States v.
> Lampley,* 573 F.2d 783 (3d Cir.1978)). Since "the defendant
> remains sentenced in any event, reviewing the concurrently
> sentenced counts is of no utility. The practice is eminently
> practical and preserves judicial resources for more pressing needs."
> *Jones v. Zimmerman,* 805 F.2d 1125, 1128 (3d Cir.1986) (citations
> omitted).

*Parkin v. United States*, 565 F. App'x 149, 152 (3d Cir. 2014). Petitioner's convictions on the

drug counts were ordered to run concurrent to his life sentence convictions on the conspiracy to

murder counts. Accordingly, because petitioner's life sentence on the conspiracy to murder

convictions would remain unchanged in the event this Court agreed with his argument as to his

sentence on the drug counts, "review [of] the concurrently sentenced counts [would be] of no

utility." *See id.* (citing *Jones v. Zimmerman*, 805 F.2d 1125, 1128 (3d Cir. 1986)). Thus, this

Court finds that petitioner is not entitled to relief on this claim.

U. Claim XXI - Ineffective Assistance of Appellate Counsel for Failing to Object to

   Hearsay-within-Hearsay Testimony of Marshal Cannon

In Claim XXI, petitioner asserts that appellate counsel was ineffective by failing to raise

a confrontation clause claim with respect to the purported hearsay-within-hearsay testimony of

Marshal Cannon. According to petitioner, he wrote to his appellate counsel, Mark Berman, Esq.,

on March 10, 2009, explaining that he needed to raise a confrontation clause claim on the

hearsay-within-hearsay testimony of Cannon.

The government counters this claim by citing to petitioner's appellate counsel's

affirmation. In his affirmation, Mr. Berman states that he discussed with petitioner his concern

regarding Cannon's testimony, but that any error was not preserved for appeal and would be subject to the high "plain error" standard. (*See* ECF 16-3 at p.9-10) According to Mr. Berman, as an unpreserved issue, he believed that it had a low likelihood of success and would have detracted from the strength of other issues on appeal. (*See id.*)

This Court finds that petitioner is not entitled to relief on this claim, particularly in light of the fact that petitioner has come forward with no evidence to indicate that Hudson County Jail did in fact have the ability to record phone calls at the time in question. At a minimum, petitioner fails to show that the outcome of his appeal would have been different had counsel raised this objection on appeal. Accordingly, petitioner is not entitled to federal habeas relief on this claim.

V. Claim XXII- Ineffective Assistance of Appellate Counsel for Failing to Raise
   Insufficiency of the Evidence on Conspiracy Counts 1 and 2

In Claim XXII, petitioner argues that appellate counsel was ineffective for failing to raise an insufficiency of the evidence claim on appeal with respect to his convictions for conspiracy on Counts 1 and 2. However, this claim was in fact raised and denied on appeal. *See Baskerville*, 448 F. App'x at 250 ("There was sufficient evidence from which a jury could have found that Baskerville intended to prevent McCray form testifying at his trial."). Accordingly, this claim is denied.

W. Claim XXIII – Ineffective Assistance of Appellate Counsel for Failing to Correct Known
   Perjured Testimony from Young and Manson

In Claim XXIII, petitioner argues that appellate counsel should have objected to the government's failure to correct known perjured testimony of Young and Manson. Mr. Berman recalls discussing with petitioner his claim that Young and Manson testified falsely. (*See* ECF 16-3 at p.11) However, he saw nothing in the trial record that would have supported raising this

claim on direct appeal. (*See id.*) This Court agrees such that appellate counsel's decision not to raise this claim did not fall below an objective standard of reasonableness.

Furthermore, to the extent that petitioner is raising this claim based on Young and Manson's testimony at Bergrin's first trial in 2011, the Third Circuit had already decided petitioner's appeal on October 13, 2011. This date was before testimony in the Bergrin I trial began. Accordingly, petitioner is not entitled to relief on this claim.

## X. Claim XXIV – Failure to Raise Prejudicial Errors with Jury Instructions

In Claim XXIV, petitioner argues that appellate counsel should have advanced prejudicial errors with respect to the trial court's jury instructions. Petitioner is not specific with respect to what part of jury instructions appellate counsel should have challenged on appeal. Nevertheless, this Court will presume that they are the same arguments that petitioner raised with respect to the jury instructions as were his ineffective assistance of trial counsel claims. For the reasons stated *supra*, those claims lacked merit. Accordingly, appellate counsel was not ineffective for failing to raise these meritless issues.

## Y. Claim XXV – Failure to Raise Sentencing Errors on Appeal

Next, petitioner asserts that appellate counsel was ineffective for not raising sentencing errors on appeal. Once again, petitioner is not altogether clear what "sentencing errors" he is claiming. However, to the extent that these "errors" are similar to the sentencing errors he claimed with respect to trial counsel, he would not be entitled to relief on this claim as his sentencing error claims based on ineffective assistance of trial counsel also failed.

Z. Claims XXVI, XXVII and XVIII – Failure to Raise Additional Plain Errors within the Trial Record; Failure to Raise a Lack of Subject Matter Jurisdiction with Respect to all Charges; and Failure to Raise any of the Ineffective Assistance of Trial Counsel Claims to the Extent they Could have been Raised on Appeal

In Claim XXVI, petitioner asserts that appellate counsel was ineffective for failing to advance on appeal "additional plain errors within the trial record." In Claim XXVII, petitioner claims that appellate counsel was ineffective for failing to advance on appeal "the lack of subject-matter jurisdiction as to all charges." Finally, in Claim XXVIII, petitioner claims that appellate counsel was ineffective on appeal by failing to raise any of the issues with respect to trial counsel's ineffectiveness that could have been raised on appeal.

Petitioner is not entitled to relief on Claim XXVI and XXVII because they rest upon vague and conclusory allegations. Such allegations "may be disposed of without further investigation by the District Court." *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000). Thus, these claims will be denied.

With respect to Claim XXVIII, petitioner is also not entitled to relief. The Third Circuit has stated that "rarely, if ever, should an ineffectiveness of counsel claim be decide . . . on direct appeal. '[T]his Court has expressed a preference that ineffective assistance of trial counsel claims be brought as collateral challenges under 28 U.S.C. § 2255, rather than . . . on direct appeal.'" *United States v. Kennedy*, 354 F. App'x 632, 637 (3d Cir. 2009) (citing *United States v. Chorin*, 322 F.3d 274, 282 n.4 (3d Cir. 2003)) (other citations omitted); *see also United States v. Brooks*, 480 F. App'x 675, 678 (3d Cir. 2012) (noting "strong preference" for reviewing ineffective assistance of counsel claims in collateral proceedings under § 2255 rather than on direct appeal). Accordingly, Claim XXVIII, will also be denied.

AA.     Claim XXIX – Cumulative Effect of Counsel's Errors

In Claim XXIX, petitioner asserts that he is entitled to relief due to the cumulative effect of counsel's errors. Errors that do not individually warrant federal habeas relief may sometimes do so when combined. *See Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (citing *Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2002)) (footnote omitted). In this case, this Court will reserve judgment on this claim because this Court will be conducting an evidentiary hearing to determine whether trial counsel was ineffective for failing to investigate/call Hakeem Curry and/or Rakeem Baskerville as witnesses at petitioner's trial.

BB.     Claim XXX – Newly Discovered Evidence

In Claim XXX, petitioner asserts that "[t]here is newly discovered evidence which establishes that defendant/movant's convictions in this case are constitutionally infirm and should thus be vacated." (ECF 1 at p.11) Among the sub-claims that petitioner makes within Claim XXX are the following:

1. Inconsistencies relative to the government's theory as to the motive for McCray's murder.

2. Inconsistent testimony from Manson on the issues of how, when and from whom she learned of information relative to the McCray murder.

3. Inconsistencies/conflicts in Young's testimony.

4. Inconsistencies/conflicts as to highly material matters.

5. Eyewitness information that casts doubt on foundation for petitioner's convictions on Counts 1 and 2.

The main area of focus on petitioner's "newly discovered evidence" arguments within Claim XXX arise from petitioner's comparison of the testimony from his trial as compared to the testimony in the 2011 and 2013 Bergrin trials.

Respondent asserts that all of petitioner's arguments within Claim XXX are time-barred. Respondent states that petitioner was required to bring these claims in a Federal Rule of Criminall Procedure 33 motion. Accordingly, respondent argues this claim (including all sub-claims) are untimely because they were not filed within the three-year period set out in Rule 33 of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 33(b)(1) ("Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.").

This Court disagrees with the government's argument that petitioner can only proceed with his arguments within Claim XXX under a Rule 33 motion. Indeed, as some courts have noted, "a defendant whose argument is not that newly discovered evidence supports a claim of innocence, but instead that he has new evidence of a constitutional violation or other ground of collateral attack, is making a motion under § 2255 (or § 2254)[.]" *United States v. Evans*, 224 F.3d 670, 674 (7th Cir. 2000); *United States v. White*, No. 12-4464, 2013 WL 12221280, at *7 n.13 (E.D. Pa. Apr. 26, 2013). Petitioner's arguments within Claim XXX fall within claims asserting that he has new evidence of a constitutional violation. Accordingly, this Court finds that petitioner has properly brought these arguments within Claim XXX in this § 2255 proceeding as opposed to a Rule 33 motion in his criminal action. Each of petitioner's arguments within Claim XXX will therefore be analyzed on their merits.

i.    *Inconsistencies relative to the government's theory as to the motive for McCray's murder*

In his first argument within Claim XXX, petitioner asserts that the government posited

inconsistent theories relative to the motive to murder McCray at petitioner's and Bergrin's trials.

In support of this claim, petitioner cites to the following portions of the government's opening

statements from his trial in 2007:

> On March 2nd, 2004, Kemo DeShawn McCray got up early. He was going to work that day with his step-father, Johnnie Davis on a construction job up in Newark. The two men, along with a couple other guys, spent the morning doing rehabilitation work in this house.
>
> Sometime after 1:00 that day, step-father and son decided to go get some cigarettes. They went out of their house, made a right turn, took a short walk down South Orange Avenue, got their cigarettes and began to walk back to the job site, walked back to work. What Kemo didn't know was that morning the defendant also had men working in the area. What Kemo didn't know was that morning there were men organized waiting to kill him. Because what Kemo didn't know was back in November, three months earlier, when defendant was arrested, he hatched a plan to have Kemo killed . . . .
>
> Second page of the complaint you'll see lays out some basic facts that are alleged at the time the complaint was issued. What you see in this complaint in that the Government chose four of the transactions to charge the defendant at that time. What you'll notice is missing is the name Kemo DeShawn McCray. What you'll see in paragraph one is "handed a confidential witness, herein after the CW." Then throughout the balance of the report, CW is used. Kemo or any derivation of his name is not used. That, members of the jury, and leaving out a couple of the transactions between Kemo and the defendant were an attempt, you'll learn by the Government, to keep his identity secret for as long as possible.
>
> However, what you'll come to learn is based on the amounts, 26 grams, 26 grams, 28 grams, 28 grams, all approximations at the time, indicated to the defendant that it must have been Kemo. What you'll come to learn is that the defendant did not normally

sell quantities that small. He was able to figure out from this complaint that it must have been Kemo.

So before that day is up, before he left federal court on November 25th, 2003, again, the defendant knew he was facing a lot of time; that the Government was seeking to keep him in jail and who Kemo was. Armed with that information, he made a decision and that decision was to pass information through his lawyer, again, neither of the gentlemen here today, to his brothers and friends outside, that Kemo's the guy.

By doing so, demanded that Kemo be killed. . . .

Now, for the two murder-related counts, what you have is this: One related to a conspiracy to murder Kemo for what he had all ready done and one related to a conspiracy for what Kemo could do to the defendant in the future.

To what had been done already, it's the retaliation against an informant, for having him locked up, for having him put in jail. Number two, for what he would do in the future, for acting as a witness in a proceeding such as this and that is why there are two separate conspiracies, although they involve the same people and although they involve the same victim, there's two different reasons why the defendant acted as he did.

Members of the jury, this is a very important case, but's also a very straightforward case. What this case boils down to is the defendant getting caught dealing drugs, the defendant being arrested by the F.B.I., the defendant being told that he faced a large jail sentence, the defendant being told that he would not be released on bail and the defendant figuring out that it was Kemo McCray who was the F.B.I. informant, who was responsible in his eyes for his situation.

(T.T. at p.3265, 3274-76, 3290-91) Comparatively, petitioner relies on the following statements during the government's October 17, 2011 opening statement in Bergrin I to assert that the government maintained inconsistent theories at the two trials:

Now, Kemo was not killed in a random act of violence, Kemo was killed in a targeted execution. And you'll hear that Kemo was killed because he had provided information to the Government about a drug-trafficking organization that the Defendant [Bergrin] was associated with. You'll hear that because Kemo had infiltrated this organization, he posed a threat not only to the organization but

to Paul Bergrin himself, because you'll see, you will learn that Paul Bergrin had, in fact, gotten involved in supplying that drug-trafficking organization with kilograms of cocaine. So it was not only the drug-trafficking organization that was on the line, it was Paul Bergrin himself, and because of that, in Paul Bergrin's world, Kemo had to die.

Now, in order to understand the motive behind this murder I'm going to have to explain a little bit more and the testimony will explain a little bit more about the background of Paul Bergrin.

Paul Bergrin is a criminal defense attorney. He specializes in representing people who are accused of committing crimes. And you'll hear that he wasn't the ordinary attorney but that, in fact, he was what's called "house counsel" for a large-scale retail drug-trafficking operation that operated in Newark. That drug-trafficking operation was headed by Hakeem Curry.

And you'll see that second person is a picture of Hakeem Curry. Now, you'll hear that for a while Paul Bergrin provided these house counsel services to Hakeem Curry's organization, and that as a part of providing those services as house counsel, he represented a number of Hakeem Curry's underlings who were arrested in selling drugs for Hakeem Curry, and you'll hear that Hakeem Curry was one of Paul Bergrin's most important clients, and that he represented a good number of arrested underlings in the organization.

You'll also hear that after a while, in addition to providing house counsel services, Paul Bergrin, in fact, became involved in supplying Hakeem Curry's organization with kilograms of cocaine. Now, Hakeem Curry ran a large-scale retail distribution operation, and as such he needed wholesale suppliers of cocaine. He would obtain the wholesale cocaine from his suppliers and distribute that on the streets of Newark. And what Paul Bergrin did, ladies and gentlemen, is that he connected Hakeem Curry with a wholesale supplier; a wholesale supplier named Jose Claudio, also known as "Changa."

You'll hear that after Paul Bergrin made this connection, Changa began to supply Hakeem Curry with kilograms of cocaine. And so Paul Bergrin went from house counsel representing a criminal organization to being a participant in that very criminal organization.

And why is that important, ladies and gentlemen?

This is important because that provides the motive for this crime. That is the reason why Paul Bergrin got involved in murdering Kemo DeShawn McCray.

Because again, he had a personal motive at this point; he was not simply representing Hakeem Curry, he was selling drugs to Hakeem Curry. And if Hakeem Curry's organization were infiltrated by law enforcement, by Kemo DeShawn McCray, his neck was personally on the line. . . .

While they were unsuccessfully searching for Kemo, Paul Bergrin took matters into his own hands. And you'll hear about a meeting Paul Bergrin had with another drug dealer named Alberto Castro. Castro was a client of Paul Bergrin's law practice, he was also a large drug dealer in Newark but he was a drug dealer that had nothing to do with Hakeem Curry.

And you'll hear that at that meeting – and, by the way, you're going to hear this directly from Alberto Castro's mouth – that what happened was Paul Bergrin offered Alberto Castro $10,000 if Alberto Castro would kill Kemo DeShawn McCray. You'll hear that he explained to Castro that he wanted Kemo killed because Kemo had informed against a member of Curry's organization and therefore he had to be killed.

Now, you'll hear that Castro turned down Paul Bergrin's offer and left. But you'll also hear that that was an important meeting. And again, the reason why it was important, ladies and gentlemen, is because it's additional evidence that Paul Bergrin wanted Kemo DeShawn McCray dead. It's additional evidence that when he passed the name of the informant from Will Baskerville to Hakeem Curry, that he did it because he wanted Kemo DeShawn McCray dead. That when he went with Hakeem Curry and Hakeem Curry's group a couple of days later and instructed them to kill Kemo and said, "No Kemo, no case," that he wanted Kemo DeShawn McCray dead. And it's also important because it corroborates what Anthony Young will testify to; that Paul Bergrin was, in fact, involved in this conspiracy to kill Kemo DeShawn McCray.

And you'll hear that after that there was another meeting between Paul Bergrin and Hakeem Curry. And you're going to hear that Ramon Jimenez – the same Ramon Jimenez who earlier tried to broker a drug deal between Curry and Changa – was present for a meeting, and at that meeting they were discussing – Paul Bergrin and Hakeem Curry, that is – were discussing Will Baskerville's

case. And that during that meeting Paul Bergrin told Hakeem Curry that if there was no witness, there was no case.

And you'll hear that when he said that, Hakeem Curry looked over at Ramon Jimenez appearing to be upset that Paul Bergrin was discussing this openly in front of Ramon Jimenez, and in response, Paul Bergrin seeing what Curry – the look he gave to Ramon Jimenez, told Hakeem Curry, "Don't worry about it. You can trust him."

Now, why would Paul Bergrin say that?

There's only one reason ladies and gentlemen: That's because "No witness, no case" was not legitimate legal advice. It was an order to kill Kemo DeShawn McCray.

That meeting was important, ladies and gentlemen, also because not only did it demonstrate further Paul Bergrin's involvement in the conspiracy to kill Kemo, but it also corroborated what Anthony Young had testified to earlier, about the earlier meeting in which Paul Bergrin instructed the group to kill Kemo and used the phrase, "No Kemo, no case."

Now, you'll hear that after this meeting they continued to look for Kemo to kill him. And you'll hear that Paul Bergrin continued to practice law, and you'll hear about another meeting between Paul Bergrin and a different client of Paul Bergrin, a client named Richard Pozo.

Richard Pozo was another large-scale drug dealer who operated primarily in Elizabeth. You'll hear that Richard Pozo was arrested in February on federal drug charges and that Paul Bergrin represented him on those federal drug charges. You'll hear that in connection with his representation, Paul Bergrin met with Richard Pozo. You'll hear that part of the reason Richard Pozo was arrested was because an individual named Pedro Ramos had cooperated and provided information to the Government about Richard Pozo's drug-trafficking activities. And you'll hear that when Richard Pozo and Paul Bergrin met in an attorney/client visit while Richard Pozo was in jail, Paul Bergrin informed Richard Pozo that Pedro Ramos was cooperating against him.

You'll also hear that Paul Bergrin asked Richard Pozo if he knew where Pedro Ramos lived. And when Richard Pozo asked why Paul Bergrin wanted that information, Paul Bergrin said, because if we can take care of Pedro Ramos, your federal case will go away.

Richard Pozo told Paul Bergrin he was not interested in killing anyone. Richard Pozo also did something else, he fired Paul Bergrin and got a new lawyer. And Richard Pozo ultimately came in and cooperated with the Government, and you'll learn about this meeting because Richard Pozo is going to tell you about it.

Now, what is the importance of this meeting?

Ladies and gentlemen, the importance of this meeting is that it shows that Paul Bergrin's intent when he performed acts in representing William Baskerville, when he passed the information of the identity of Kemo from William Baskerville to Hakeem Curry, when he instructed the Curry group to kill Kemo, that his intention was, in fact, to kill Kemo. That he was counseling another client to kill a cooperator against him at the same time they're plotting to kill Kemo demonstrates his intent and it demonstrates it very powerfully. . . .

He [Bergrin] was not acting as a legitimate lawyer when he solicited Albert Castro and offered to pay him $10,000 to kill Kemo. Instead, ladies and gentlemen, what the evidence will show was that he was acting as a member of the Curry organization, because that's exactly what he was. He had supplied the Curry organization with drugs, and therefore, since Kemo had infiltrated that group, he had the same incentive as every single other member of that group to kill Kemo, because he knew that infiltrating the organization could ultimately lead to him being prosecuted for serious federal crimes; crimes he knew he had committed with Hakeem Curry. And that motive dictated and directed every act he took after that. He passed the name, the identity of the informant from Will Baskerville to Hakeem Curry because he wanted Kemo dead; he instructed, not once, but twice, members of the Curry organization to kill Kemo because he wanted Kemo dead; and he solicited Albert Castro for $10,000 to kill Kemo because he wanted Kemo dead.

Ladies and gentlemen, the evidence will prove overwhelmingly that Paul Bergrin conspired to kill Kemo DeShawn McCray to prevent him from testifying at trial and that he aided the killing of Kemo DeShawn McCray to prevent him from testifying at trial. Back in November of 2003, Paul Bergrin made a choice; he made a choice that protecting himself and the drug organization was more important that the life of Kemo DeShawn McCray.

(Crim. No. 09-369 ECF 287 at p.4-7, 15-19, 29-30)

At the outset, it is worth noting that the Supreme Court has not held that the issue of inconsistent theories rises to the level of a due process constitutional violation. *See Bradshaw v. Stumpf*, 545 U.S. 175, 190 (2005) (Thomas, J., concurring) ("This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories."); *Koehler v. Wetzel*, No. 12-291, 2015 WL 2344932, at *31 (M.D. Pa. May 14, 2015) ([T]he *Bradshaw* Court did *not* hold that the use of inconsistent theories in the separate prosecutions of two defendants violates the right to due process.") (emphasis in original). Nevertheless, even if pursuing inconsistent theories rises to the level of a due process violation in the abstract, this Court agrees with the government that in this specific instance, the proffered motives for killing McCray were not inconsistent between petitioner's and Bergrin's trials.

Baskerville was charged with both conspiracies to murder a witness as well as to retaliate against an informant. Bergrin was charged with conspiracy to murder a witness. The overarching motive for both was to disrupt the government's investigation into the Curry drug organization. That the government stressed the personal motives of Baskerville as compared to Bergrin at their separate trials is not surprising. However, both related to the overarching motive to get rid of McCray because of the involvement with the Curry organization and what he could or had already supplied to the government to support its investigation. Accordingly, petitioner is not entitled to relief on this argument.

    ii.    *Inconsistent testimony by Manson as to how, when and from whom she learned of information about the McCray murder*

Petitioner next argues that Manson gave inconsistent testimony regarding how she learned of information about the McCray murder. Petitioner states as follows in his declaration;

(1) At my trial in 2007 she [Manson] claimed to have had no leads regarding the McCray murder until Anthony Young came forward, (TR, at 3887), but at the Bergrin trial in 2011 she said informants provided information to the effect that a "Fat Ant" or "Anthony Rodgers" was the person who killed McCray, (Bergrin 10/18/11 TR., at 160-63); (2) those informants were identified as Shelton Leveret and Curtis Jordon and based on their information she began an investigation of "Fat Ant" and "Anthony Young" before Young came forward in 2005 and she eventually learned that "Fat Ant" and Anthony Young are the same person, (Bergrin 10/18/11 TR., at 160-63); and (3) a jailhouse informant, Roderick Boyd, who was housed at the Passaic County jail with William (Malik) Lattimore, provided her with information to the effect that Lattimore told him that he was responsible for McCray's murder, which information was put in an FBI 302 report and provided to Bergrin in a Jencks disclosure, (Bergrin 10/19/11 TR., at 215-221).

None of the above referenced information presented through Agent Manson . . . at the Bergrin trial was provided to me in any form prior to or during my trial in 2007.

(ECF 1-1 at p.11)

This Court construes petitioner's first two arguments quoted above as an attempt to bring a claim that the government knowingly presented or failed to correct false testimony in his criminal proceeding because petitioner is essentially asserting that Manson testified falsely at his trial. Construed as such, petitioner appears to be claiming that the prosecutor knowingly permitted the perjured testimony of Manson regarding having no leads in the McCray murder. The relevant portion of Manson's testimony at petitioner's trial was as follows:

Q: Let's move on, then, to a person by the name of Anthony Young.
A: Yes.
Q: Was he known by any other nickname?
A: Fat Ant.
Q: By January of 2005, did you have some of these cooperators that we just talked about providing information on the William Baskerville case?
A: Yes we did.
Q: But prior to January of 2005, did you have any lead as to who the shooter was in the case?

A: No, we did not.

Q: Let me just go back. In July of 2004, did you have any communication with Detective Sabur, lead homicide detective, regarding a possible suspect –

A: Yes.

Q: -- for the shooting?

A: I had spoken with Detective Sabur and passed onto Detective Sabur the name of Maleek Lattimore, who is an individual who is part of the William Baskerville/Hakim Curry crew and is also known to be a hit man. [¶] I passed on his name to Detective Sabur and Detective Sabur then did a photo array with one of the witnesses from the homicide.

Q: Okay. And why did you give William Lattimore's name to Detective Sabur?

A: I gave him the name for two reasons. His physical description fit that of one we had received from one of the witnesses and also I had known William Lattimore to be a hit man for the Curry organization.

Q: But other than that, there was no other information?

A: No, there was no other information. It was a best guess on our part.

Q: All right. So it was a guess to see what, if anybody –

A: Can get an identification, yes.

Q: I'll just show you Government Exhibit 206.

A: Yes, 206 is a photograph of William Lattimore . . . .

Q: Agent, what was the result – by the way, the witness who was shown the photo of William Lattimore –

A: Yes.

Q: -- what was his name?

A: Mr. Johnnie Davis.

Q: Okay. What was the result of that name?

A: He was not able to make an identification.

Q: Did you go out and interview Mr. Lattimore after July of '04?

A: No, we did not.

Q: Did you arrest him?

A: No. We – this was not an issue at this stage, after he could not identify Lattimore.

Q: Okay. So let's turn to a Friday, January 14th, 2005.

A: Yes.

Q: Can you tell the jury what happened that afternoon?

A: that afternoon, we have what we call complaint duty, meaning an agent staffs the telephone, F.B.I. telephone 24 hours a day, seven days a week. [¶] What had happened that afternoon is an agent by the name of William Gale had complaint duty and was manning the phones when Anthony Young made a call into the F.B.I. office. [¶] He spoke to Agent Gale, explaining to Agent Gale

that he had specific information regarding the death of a federal witness and as well as who was involved in the conspiracy to kill this witness. [¶] Agent Gale took down the facts as Anthony Young provided them. In do so, he checks – we have an internal computer system where if you check various names, for example, William Baskerville, my case number is going to pop up. [¶] Once William – Agent Gale checked and saw that we did, in fact, have an investigation into the death of Kemo McCray, he then contacted me on the telephone. I was in the office just a couple floors down. [¶] He contacted me and said that Anthony Young had just called in and he would like to provide information on the death of Kemo McCray.388

Q: Before that phone call to the switchboard at the F.B.I. –

A: Switchboard, the main number, yes.

Q: Before that phone call, do you have any information or any knowledge of Anthony Young, also known as Fat Ant?

A: I had heard the name and knew that Fat Ant was a member of William Baskerville's crew and also Hakim Curry's crew and that he went by Fat Ant. [¶] We had been trying to determine his identity, but had not yet been able to do so, but we did not know of Fat Ant to be involved in Kemo's murder.

(T.T. at p.3887-90) During Bergrin I, however, Manson testified as follows:

Q: Agent, when we broke we were discussing the various informants that you discussed obtaining information regarding Kemo's murder. Is that correct?

A: Yes.

Q: Now, one of those informants – well, let me ask you: How many informants ultimately provided information relating to the investigation?

A: During what stage? Initially there was a handful, and then eventually there was –

Q: Initially.

A: Initially? At least three different informants.

Q: Now, one of them is named Shelton Leveret?

A: Yes.

Q: And did he provide you with information regarding what he had learned about the murder of Kemo.

A: Yes.

Q: Based on that information, did you continue to investigate members of the Hakeem Curry organization?

A: Yes, I did.

Q: And based on that information did you attempt to identify an individual known as Fat Ant?

A: Yes, I did. . . .

Q: Was there a second individual who came and provided you with information?
A: Yes, there was.
Q: And was that individual named Curtis Jordan?
A: Yes.
Q: And did he provide you with information specific to the murder?
A: Yes, he did. . . .
Q: Again Agent, based on what he told you, who did you go and investigate?
A: An individual by the name of Anthony Rogers?
Q: And did Anthony Rogers also have a nickname?
A: He is also known as Fat Ant. . . .
Q: Let me – Curtis Jordan –
A: Yes.
Q: -- is the second individual who provided information?
A: Yes.
Q: Based on that information, who did you attempt to investigate?
A: Fat Ant.
Q: And did he go by another name, the individual that you were trying to investigate, based solely on Curtis Jordan's information?
A: Anthony Rogers.
Q: Now, moving to a third individual. Did you start an investigation or look during the course of this investigation to another individual?
A: Yes.
Q: Okay. And who did you look towards?
A: Hakeem Curry.
Q: A fourth sources, did you speak to a fourth source with information on the Kemo murder?
A: Yes.
Q: And that source, did he provide information?
A: Yes.
Q: And based on that information, who did you begin to look at?
A: William Baskerville.

(Crim. No. 09-369 ECF 288 at p.160-63)

"A State violates the Fourteenth Amendment's due process guarantee when it knowingly presents or fails to correct false testimony in a criminal proceeding." *See Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 145-46 (3d Cir. 2017) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Lambert v. Blackwell*,

387 F.3d 210, 242 (3d Cir. 2004)). "[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976), *holding modified by United States v. Bagley*, 473 U.S. 667 (1985). Accordingly, in order to state a claim, petitioner must show that the witness: (1) committed perjury; (2) the government knew or should have known of this perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict. *See Lambert*, 387 F.3d at 242-43. It is important to note, however, that "[d]iscrepancy is not enough to prove perjury. There are many reasons testimony may be inconsistent; perjury is only one possible reason." *Id.* at 249. "That some testimony may be inconsistent with that given in the first trial does not by itself constitute perjury." *See United States v. Mangiardi*, 173 F. Supp. 2d 292, 307 (M.D. Pa. 2001) (citing *United States v. Thompson*, 117 F.3d 1033, 1035 (7th Cir. 1997); *United States v. Arnold*, Nos. 99-cv-5564, Crim. 95-153-01, 2000 WL 288242, at *4 (E.D. Pa. Mar. 2000)); *see also Tapia v. Tansey*, 926 F.2d 1554, 1563 (10th Cir. 1991) ("Contradictions and changes in witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony.") (cited approvingly in *United States v. Stadmauer*, 620 F.3d 238, 269 (3d Cir. 2010)).

Petitioner fails to show that there is a reasonable probability that the purported false testimony by Manson at his trial could have affected the verdict. Indeed, petitioner fails to show how the method Manson discovered that Young was a suspect in the murder would have changed the outcome of the proceeding to a reasonable probability. Young, the person with whom petitioner claims Manson should have testified to at his trial she had discovered was a

possible suspect, testified at great length during petitioner's trial. The jury had ample opportunity to determine his credibility regarding his admission that he killed McCray. This Court fails to see how the fact that Manson did not testify during petitioner's trial how she initially discovered Young as a suspect could have affected the verdict to any reasonable probability. Rather than the aspect of discovering Young as a suspect in the murder as being necessarily important at trial, the key fact was that Young testified to murdering McCray. To reiterate, Young testified at length during petitioner's trial. The jury was completely free to weigh his credibility. Accordingly, petitioner is not entitled to relief on this argument.

Next, petitioner argues that Manson was provided with information from a jailhouse informant, Roderick Boyd, that someone else was responsible for McCray's murder. Manson interviewed Boyd on June 17, 2004. However, petitioner asserts that he was never provided with an F.B.I. 302 report prepared by Manson related to this interview. The record is not entirely clear at this time whether petitioner was in fact provided with a copy of this F.B.I. 302 report prior to trial. Indeed, petitioner's trial attorneys state in their declarations that they do not recall whether they knew about Boyd's statements. (*See* ECF 16-1 at p.13 n.6; ECF 16-2 at p.15 n.6) The government's supplemental response also does expressly not address whether the report was disclosed to petitioner's defense. (*See* ECF 34 at p.7-8)

The relevant portion of the F.B.I. report stated that Boyd was incarcerated with Norman Sanders and Malik Latimore. (*See* ECF 34 Ex.4) According to Boyd's interview with Manson at the time, Laitmore and Sanders talked openly about killing a snitch on S. Orange and 19th Street, Newark. (*See id.*) Boyd told Manson that Latimore killed him and was still waiting on getting paid by "Currie" for the job. (*See id.*)

Petitioner argues that Boyd's F.B.I. 302 report "points to someone other than Young admitting to being McCray's murderer. Had Petitioner been provided with the suppressed F.B.I. 302 report, it could have undoubtedly led to investigation that could have proved vital to the defense, and could have undermined aspects of the Government's case[.]" (ECF 29 at p.57) Petitioner also asserts that the report could have been used to undermine the testimony of Manson and Young.

Petitioner is making a *Brady v. Maryland*, 373 U.S. 83 (1963) claim in light of the government's purported failure to provide him with a copy of the F.B.I. 302 report regarding Boyd's interview in 2004. A due process violation under *Brady* "occurs if: (1) the evidence at issue is favorable to the accused, because either it is exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn,* 642 F.3d 126, 133 (3d Cir. 2011) (citations omitted). Materiality requires "a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." *Id.* (citing *Giglio v. United States,* 405 U.S. 150, 154 (1972)).

Respondent argues that petitioner is not entitled to relief because the information contained in Boyd's F.B.I. 302 report is entirely cumulative of information addressed during Baskerville's trial. Respondent argues as follows:

> The FBI 302 Report describes that Boyd provided information to the FBI regarding a murder possibly committed by Malik Lattimore, about which Agent Brokos [Manson] testified. Baskerville's claim that the FBI 302 Report somehow would provide more details or an explanation to this testimony is incorrect. Baskerville's claim that FBI 302 report would have provided impeachment of Brokos [Manson] is also incorrect since Brokos's [Manson's] testimony matches the contents of the FBI 302 Report.

(ECF 34 at p.7) This argument by respondent requires further inquiry.

Manson testified as follows during petitioner's trial:

> Q: Let's move on then, to a person by the name of Anthony
> Young.
> A: Yes.
> Q: Was he known by any other nickname?
> A: Fat Ant.
> Q: By January of 2005, did you have some of these cooperators
> that we just talked about providing information on the William
> Baskerville case?
> A: Yes, we did.
> Q: But prior to January of 2005, did you have any lead as to who
> the shooter was in the case?
> A: No, we did not.
> Q: Let me just go back. In July of 2004, did you have any
> communication with Detective Sabur, lead homicide detective,
> regarding a possible suspect –
> A: Yes.
> Q: -- for the shooting?
> A: I had spoken with Detective Sabur and passed onto Detective
> Sabur the name of Maleek Lattimore, who is an individual who is
> part of the William Baskerville/Hakim Curry crew and is also
> known to be a hit man. I passed on his name to Detective Sabur
> and Detective Sabur then did a photo array with one of the
> witnesses from the homicide.
> Q: Okay. And why did you give William Lattimore's name to
> Detective Sabur?
> A: I gave him the name for two reasons. His physical description
> fit that of one we had received from one of the witnesses and also I
> had known William Lattimore to be a hit man for the Curry
> organization.
> Q: But other than that, there was no other information?
> A: No, there was no other information. It was a best guess on our
> part.
> Q: All right. So it was a guess to see what, if anybody –
> A: Can get an identification, yes.
> Q: I'll just show you Government Exhibit 206.
> A: Yes, 206 is a photograph of William Lattimore.
> MR. FRAZER: I would enter 206 into evidence if there is no
> objection.
> MR. HERMAN: No.
> (G-206, photo of William Lattimore, is marked in evidence.)
> Q: Agent, what was the result – by the way, the witness who was
> shown the photo of William Lattimore –

A: Yes.

Q: -- what was his name?

A: Mr. Johnnie Davis.

Q: Okay. What was the result of that name?

A: He was not able to make an identification.

Q: Did you go out and interview Mr. Lattimore after July of '04?

A: No, we did not.

Q: Did you arrest him?

A: No. We – this was not an issue at this stage, after he could not identify Lattimore.

Q: Okay.

(T.T. at p.3387-89) Comparatively, Manson testified as follows in Bergrin I:

Q: Did there come a time when you began to look at an individual named Malik Lattimore?

A: Yes.

Q: And was that based on information that you received from a source?

A: Yes.

Q: And ultimately does that information get passed as well as this other information, get passed along to the Newark Police Department?

A: Yes it does.

Q: And, to your knowledge, did the Newark Police Department do any further investigation with the information you provided?

A: Yes, they did.

Q: And can you tell use what that was?

A: We had – I had provided Detective Sabur with the name of Malik Lattimore as a possible shooter in the homicide, and I provided Detective Sabur with a photograph of Malik Lattimore. Detective Sabur brought in a witness and showed that witness a photograph of Malik Lattimore.

Q: And when you say "a witness," you mean a witness in the murder?

A: Yes.

Q: And what were the results of that photograph array?

A: It was non conclusive.

Q: Meaning?

A: He was not able to identify – the witness was not able to identify Malik Lattimore as the shooter.

(Crim. No. 09-369 ECF 288 at p.164-65) In Bergrin II, Manson testified as follows:

Q: Now, did there come a time when you focused the attention of your investigation at trying to identify a shooter amongst the Curry group?

A: Yes.

Q: And did an individual named Malik Lattimore come to your attention?

A: Yes, he did.

Q: And why did he come to your attention?

A: Through another source that we had developed at the time.

Q: And who was that?

A: His name was Roderick Boyd.

Q: And what did you learn from Mr. Boyd?

A: I learned from Mr. Boyd two things. One, he was incarcerated with several members of the Curry and Baskerville organization, and that he had found a photo that said KOS, meaning kill on site, of Lachoy Walker, I believe his name is. And the second thing is, he said that Malik Lattimore is one of the enforcers for the Curry Organization, and that Lattimore killed the snitch at South Orange Avenue and South 19th Street. . . .

Q: Now, you said Malik Lattimore is now on the radar of the F.B.I.?

A: Yes, he is.

Q: And what, if anything, did you do with that information?

A: I passed that information on to Investigator Sabur and Investigator Susan Bzik, Investigator Bzik is Sabur's counterpart at the Essex County Prosecutor's Office, and I had asked that they show – that they put together a photo array containing Malik Lattimore's photograph for Johnny Davis to look at.

Q: And do you know whether or not that happened?

A: Yes, it did happen.

Q: And do you know whether or not he was able to identify Mr. Lattimore?

A: There was no positive ID of Mr. Lattimore.

Q: As a result of that, what did you do next?

A: We continued to develop information as best as possible through different sources. We were trying to obtain more information on Malik Lattimore, but we kept focusing on just trying to get as much information as possible.

(Crim. No. 09-369 ECF 464 at p.237-38)

The testimony by Manson with respect to this issue at petitioner's trial when compared to that given particularly at Bergrin II does not precisely track the information in the F.B.I. 302 report. Indeed, Manson's testimony at petitioner's trial does not mention Boyd's role at all.

Given that it appears, or at best is unclear whether petitioner was even provided with a copy of the F.B.I. 302 report from the June 17, 2004 interview with Boyd, and the fact that respondent's cumulative argument is questionable based on the record, this Court will hear argument as well as any other further evidence by both parties at the evidentiary hearing on this claim. At the hearing, the parties may wish to address whether this Court is properly considering this claim as a *Brady* claim. If so, the parties will be free to argue whether petitioner can properly bring this *Brady* claim at this time in this § 2255 proceeding. Additionally, if petitioner can properly bring this *Brady* claim in this proceeding, the parties shall also be prepared to address whether or not petitioner has established the elements of a successful*Brady* claim with respect to Boyd's F.B.I. 302 report. Thus, this Court will reserve judgment on this claim at the present time.

iii.     *Inconsistencies/Conflicts with Anthony Young's Testimony*

Petitioner next argues that there were material inconsistencies and conflicts in Young's testimony as compared to Young's testimony at Bergrin I. For these claims, it is important to specifically examine Young's entire testimony at both trials as it relates to each issue raised by petitioner.

a.    Diedra Baskerville's presence at November 25, 2003 meeting

Petitioner states that Young testified at his trial that Deidra Baskerville was present at a meeting on November 25, 2003 (*See* T.T. at p.4343), but excluded her presence at this same meeting during Bergrin I. (Crim. No. 09-269 ECF 295 at 122-29) Petitioner fails to recognize that Young testified on cross-examination during Bergrin I trial that Diedra was there at least for part of the time. (*See id.* ECF 296 at p.153, 160) Thus, petitioner fails to show that Young's statement at his trial constituted perjured testimony as opposed to just an inconsistency or being more specific during Bergrin I. *See Ellis v. City of Pittsburgh*, 656 F. App'x 606, 610 (3d Cir.

2016); *Graham v. Wingard*, No. 16-839, 2017 WL 4550987, at *7 (M.D. Pa. Oct. 12, 2017) ("[M]ere inconsistencies in testimony fall short of establishing perjury and most certainly do not establish that the [prosecutor] knowingly utilized perjured testimony.") (internal quotation marks and citations omitted). Accordingly, petitioner is not entitled to relief on this argument.

b. How Young learned of petitioner's federal arrest

Next, petitioner claims that Young testified at his trial that he learned of petitioner's arrest through Diedra Baskerville, but, during Bergrin I, Young testified that he learned about it through Rakeem Baskerville, petitioner's brother. (*See* ECF 1-1 at p.11). A review of the testimony from these two proceedings show that petitioner is not entitled to relief on this argument.

During petitioner's trial, Young testified that he learned that petitioner had been arrested from petitioner's wife and his brothers. (*See* T.T. at p.4341) More specifically, Young testified that he found out when he got a call from Rakeem Baskerville. (*See id.* at p.4342) Thereafter, Young testified that Deidra told him it was the F.B.I. who arrested petitioner. (*See id.* at p.4344) Comparatively, during Bergrin I, Young testified that he learned petitioner had got arrested by "the feds" through Rakeem Baskerville. (*See* Crim. No. 09-269 Dkt. No. 295 at p.122)

The differences that petitioner notes in this claim stem from a level of detail and context, not perjury. In both trials, petitioner notes that he found out petitioner had been arrested from Rakeem Baskerville. Additionally, petitioner fails to show how this testimony is necessarily material even if this Court were to construe it as perjured testimony that the prosecution knew about. Accordingly, he is not entitled to relief on this argument.

c. People present in vehicle on November 25, 2003

Petitioner next argues that he is entitled to relief due to Young's inconsistent testimony regarding who was present in the vehicle on November 25, 2003, when Curry received a call from Bergrin. To support this claim, he cites to testimony from his trial whereby Young testified that himself, Rakeem Baskerville and Hakeem Curry were present in Hakeem's truck when he spoke to Bergrin on the phone. (*See* T.T. at p.4350) However, during Bergrin I, petitioner states that Young testified that Hakeem Curry, himself and Jamal Baskerville were in the truck during this call. (*See* Crim. No. 09-369 ECF 295 at p.230)

Petitioner fails to show that he is entitled to relief on this claim. First, petitioner has failed to show that this inconsistency regarding whether it was Jamal or Rakeem Baskerville in the vehicle rises to the level of perjury committed at his trial. Second, petitioner fails to show how this purported testimony of whether it was Rakeem or Jamal in the truck was material to his case. The importance of the testimony was the substance of the phone call between Curry and Bergrin, not who necessarily sat in the front passenger seat of Curry's vehicle when Bergrin spoke to Curry over the phone.

d. What Young was told about petitioner's sentencing exposure

Petitioner next claims that Young was inconsistent in his testimony regarding when he learned that Baskerville was facing life imprisonment. In support of this claim, petitioner relies on Young's testimony at his trial whereby Young stated that he learned that day petitioner was arrested that petitioner was facing life imprisonment. (*See* T.T. at p.4359) Later on during his testimony at petitioner's trial, however, Young testified that Bergrin also told him four of five days later that petitioner was facing life imprisonment. (*See id.* at p.4360)

During Bergrin I, Young testified that it was Bergrin who told him that petitioner was facing life imprisonment, as Young as well as others were surprised at that sentencing exposure given the charges. (*See* Crim. No. 09-369 ECF 295 at p.141) Subsequently during Bergrin I, when presented with his former testimony at petitioner's trial, Young testified that he did not remember Curry saying that petitioner was facing life imprisonment on the day he was arrested, "but at the time I said it, I must have remembered, yes, I did say that." (*Id.* ECF 316 at p.147)

Young's lack of memory regarding whether Curry told him on the night petitioner was arrested that he was facing life imprisonment does not establish that Young's testimony at petitioner's trial constituted perjury. Indeed, as expounded upon during Bergrin I, Young simply could not remember that fact. Accordingly, petitioner fails to show that he is entitled to relief on this claim.

Additionally, petitioner also fails to establish how this purported testimony regarding when he found out petitioner's sentencing exposure is material. Therefore, he is not entitled to relief on this claim.

e. Determination of who would kill McCray

Next, petitioner asserts that Young was inconsistent in his testimony regarding whether it had been determined who would kill McCray. In support of this argument, petitioner first relies on the following testimony from Young at petitioner's trial:

> Q: And at that point on that day, now, whatever it is, four, five
> days after the defendant was arrested, had it been determined if
> Kemo was found who would actually shoot him [McCray]?
> A: No.
> Q: Why not?
> A: Because either Jamal McNeil was going to do it or I was going
> to do it.
> Q: Why wasn't it decided? Like why wasn't it decided absolutely
> you or absolutely him?

A: Because if he was seen and one of use wasn't around, the other one had to do it.

(T.T. at p.4364) Comparatively, petitioner then cites to part of Young's testimony in Bergrin I to support this claim. In Bergrin I, Young was asked whether any decisions were made that day regarding whether Young would shoot Kemo if the opportunity presented itself. Young stated that he "told Hakeem, I said, if I could get him first I'm going to get him, I said, because I could use that $15,000." (Crim. No. 09-369 ECF 295 at p.147)

As the government notes, the two statements from the two trials are not inconsistent. Rather, Young's answers related to somewhat different questions. In Bergrin I, Young was asked if he would kill Kemo if the opportunity presented itself. This is not inconsistent with his testimony during petitioner's trial as he noted that if one of them between himself and Jamal McNeil were not around, the other would kill Kemo. Accordingly, petitioner fails to show that he is entitled to relief on this claim.

    f.  Gloves

Petitioner next asserts that Young stated in Bergrin I for the first time that he put on gloves in picking up the gun and that he removed the bullets and wiped or cleaned them off. However, the fact that Young was more specific in his testimony during Bergrin I that he put on gloves and wiped or cleaned the bullets off does not entitle him to relief as it does not show that Young perjured himself. Instead, Young being more specific during Bergrin I does not amount to perjured testimony. Furthermore, petitioner fails to show how Young not telling the jury in his case that he put on gloves was material to his case. Thus, petitioner is not entitled to relief on this claim.

g. Fully automatic gun

Petitioner next claims that Young testified during Bergrin I for the first time that the gun he used to kill McCray was fully automatic. Petitioner is not entitled to relief on this claim.

Young testified at petitioner's trial that he fired "three or four times." (*See* T.T. at p.4399) During Bergrin I, Young testified that he pulled the trigger once and three or four shots came out really fast. (*See* Crim. No. 09-369 ECF 295 at p.192) Unlike in Bergrin I, Young was not questioned at petitioner's trial though about the type of gun he used. This Court fails to see how petitioner can show that Young's testimony in this instance at his trial amounted to perjury, that the government was aware that this was perjury, or how this affected petitioner's trial. Rather, Young was merely asked more specific questions during Bergin I as compared to petitioner's trial on this topic. Accordingly, petitioner is not entitled to relief on this claim.

h. Stipulation in Bergrin I that Young never said gun was fully automatic at petitioner's trial.

Petitioner also appears to challenge a stipulation between the parties in Bergin I that Young never testified that the gun was fully automatic at petitioner's trial. Like the previous claim, however, merely because Young was asked more specific questions during Bergrin I does not amount to perjury committed at his trial, let alone entitle petitioner to relief by showing that the government permitted perjured testimony at his trial. Petitioner does not show that Young testified at his trial that the gun he used was *not* automatic, which then would be in direct conflict with the testimony during Bergin I. As such, this Court does not find this claim entitles petitioner to relief in this § 2255 proceeding.

i. Driving past McCray after he was shot and getting out of the vehicle

Petitioner next claims that there were inconsistencies in Young's testimony regarding whether Curry got out of his car to check that McCray was dead when he drove past. During

93

petitioner's trial, Young testified that Curry did not get out of his car when he drove past McCray to see if he was dead. (*See* T.T. at p.4409) However, in Bergrin I, Young testified that Curry got out of his truck when he looked at McCray. (*See* Crim. No. 09-369 ECF 295 at p.204)

This Court finds that this slight inconsistency from Young about whether Curry got out of his truck or not after McCray was shot to view McCray does not amount to perjury, let alone testimony that the government knew was false. Furthermore, petitioner fails to show how the testimony in Bergrin I as opposed to his trial would have changed the outcome of his trial. Accordingly, petitioner is not entitled to relief on this claim.

j.   Young's failure to mention during his trial that he took his fleece jacket and gloves off.

Petitioner's next inconsistent testimony claim as it relates to Young's testimony is as follows:

> For the first time, at the 2011 Bergrin trial, Young said there was
> blood on his jacket and gloves and that when Curry arrived at a
> garage to pick up Young and Rakeem Baskerville that he took his
> fleece jacket off and balled up the gloves inside of it.

(ECF 1-1 at p.13) That Young was more specific during Bergrin I then he was than at his trial on this point does not rise to the level of perjury. Accordingly, petitioner is not entitled to relief on this claim.

k.   Firing gun 3-4 times versus pulling the trigger once and letting out three shots

Similar to one of petitioner's prior claims of Young's purported inconsistent testimony, petitioner appears to reiterate his claim that he is entitled to relief because Young testified at his trial that he fired the gun 3-4 times at McCray, but during Bergrin I, Young testified that he pulled the trigger once and three or four shots came out. Once again, this difference amounts to a level of specificity as opposed to testimony amounting to perjury, let alone that the government

knowingly permitted perjured testimony. At neither trial did Young testify that he pulled the trigger more than once. Instead, he was asked this specific question during Bergrin I, but not during petitioner's trial. This purported inconsistency as alleged by petitioner does not entitle him to relief that the government permitted Young to commit perjury at petitioner's trial.

l.   Running around the car after McCray was shot

Petitioner next states that at his trial Young testified that when McCray fell petitioner jumped over the body and then jumped into the passenger seat. During Bergrin's trial, petitioner notes that Young testified that he jumped over McCray, ran around the back of the car and jumped into the passenger seat. That Young provided more detail that he ran around the back of the car after he jumped over McCray during Bergrin I does not amount to perjury nor does petitioner show how this difference was material to his conviction. Accordingly, petitioner is not entitled to relief on this claim.

m.  Trips to Ben's Auto Shop, who took the bullets out of gun before melting it, and who melted the gun

Next, petitioner asserts several inconsistencies in Young's testimony between his trial and Bergrin I on the following issues: (1) how many times did Young visit Ben's Auto Body Shop; (2) who took the bullets out of the gun before it was melted; and (3) who melted the gun. More specifically, petitioner claims that at his trial, Young testified that he and Rakeem only visited the body shop on the night of the murder, but during Bergrin I, that they went there twice. Furthermore, petitioner states that Young testified at his trial that Rakeem took the bullets out before it was melted, but during Bergrin I, Young testified that he took the bullets out. Finally, petitioner states that Young testified at his trial that Ben's nephew and then another worker melted the gun, whereas during Bergrin I, Young testified that Ben started melting the gun and

then Ben's nephew took over. These inconsistencies aside, petitioner fails to show how these differences affected his verdict in a material way.

n. Throwing clothes away

Petitioner's next inconsistency with Young's testimony at the two trials is as follows:

> For the first time, at Bergrin's 2011 trial, Young said he had a bag of clothes (including the fleece jacket and gloves that he claimed had blood on them) and threw them in the dumpster near the IYO center when he got out of the car before going to Ben's Auto Body shop, which is the same dumpster where Young claimed he threw the melted gun in.

(ECF No. 1-1 at p.16)

The fact that Young may not have mentioned that he threw away his clothes during petitioner's trial, but did in Bergrin I, does not amount to perjury. It simply reflects the greater level of detail Young testified to regarding the planning and execution and aftermath of the murder of McCray in Bergrin I. Furthermore, petitioner fails to show how this testimony would have changed the outcome of his trial in a material way. Accordingly, he is not entitled to relief on this claim.

o. Petitioner's demand to kill McCray

Next, petitioner alleges that Young testified for the first time in Bergrin I that petitioner never demanded that he kill McCray and that he had no contact with him from November 25, 2003 (the date of petitioner's arrest), until March 2, 2004 (the date McCray was murdered).

Petitioner mischaracterizes Young's testimony. Indeed, during petitioner's trial, the following colloquy took place when Young was on the witness stand:

> Q: In your mind, when you got that information, was that a request?
> A: More like a request demand.
> Q: There's a difference between a request and demand. Which did you think is was?

A: Demand.

Q: And why do you think it was a demand?

A: Cause if this guy still around, then one of the Baskerville's go to prison.

(T.T at p.4355) Comparatively, the testimony during Bergrin I was as follows:

Q: Now, did Will Baskerville ever give you any orders?

A: No. He didn't give me a order.

Q: Did Will Baskerville ever give you a demand or a request?

A: He gave me a – he gave us a request, but he never gave me a demand.

Q: Now –

A: Excuse me.

Q: -- he never gave you a demand, correct?

A: No, not a demand.

Q: And as a matter of fact, you never even had any conversations with Will Baskerville from November 25th even until today, as you sit here today.

A: Yes, I did.

Q: You had a conversation with Will Baskerville?

A: Yes, sir.

Q: From November the 25th, the date of his arrest, until March of 2004, did you have any conversations with Will Baskerville?

A: No.

Q: Did you have any letters or communications with Will Baskerville, Anthony Young?

A: No, just him sending us messages, that's it.

Q: Just him sending you messages. You didn't have any direct contact with Will Baskerville; right?

A: Wasn't trying to be around him.

Q: And like you said, he would never ever give you a demand; right?

A: No, he didn't demand me to do nothing.

Q: Okay. Look at page 4354, line 17 and 18. Do you see the question: "How would you characterize the message from defendant," meaning Will Baskerville? Then look at your answer on page 4354.

A: I'd say it was more like a demand, but it was a request.

Q: Well, you said it was a request.

A: It say it right there. "There's a difference between a request and demand."

Q: Okay. Excellent. Flip the page now. Turn to page 4355, line two.

A: Yes.

> Q: Isn't it a fact that you used the word that it was a demand, not a
> request?
> A: No, it was a request. I used "demand," yes.
> Q: Isn't it a fact that you were asked a specific question, was it a
> request for a demand from Will Baskerville, and you just told this
> jury that it wasn't a demand before you flipped the page?
> A: I'm telling them again, it was a request.
> Q: You told this jury in April 13th of 2007 it was a demand, d-e-m-
> a-n-d. Isn't that the word that came out of the mouth of Anthony
> Young.
> A: He say he wanted Kemo dead.

(Crim. No. 09-369 ECF 316 at p.113-15)

This Court does not find that such testimony at petitioner's trial amounts to perjured

testimony. Indeed, in both trials, Young seemed to testify that it was between a request and a

demand. At petitioner's trial, Young was specifically asked what he thought. Comparatively, at

Bergrin I, Young was asked what petitioner did. Such a difference does not amount to perjured

testimony that warrants petitioner relief on this claim. Accordingly, this claim will be denied.

p.  Whether Bergrin used term "If Kemo was dead"

Next, petitioner states that Young testified at his trial that Bergrin told a group of people

at a meeting that "if Kemo was dead, that Will Baskerville would definitely come home from

jail." (ECF 1-1 at p.14) However, he claims that in Bergrin I, Young admitted that Bergrin did

not use the term "dead." (*See id.*)

The testimony from the two trials provide context to this claim. During petitioner's trial

the following testimony occurred when Young testified on direct:

> Q: Did Paul Bergrin say anything to you or make any promises if
> Kemo was taken care of?
> A: He said if there was no Kemo to testify against Will, there
> would be no case.
> Q: Did he say whether or not he would be able to get William
> Baskerville out of jail?
> A: He said for sure.
> Q: Did Mr. Bergrin ask about any payment?

A: He didn't ask about the payment.
Q: Tell the jury what he did, I guess?
A: He just said, if Kemo was dead, that Will Baskerville would definitely come home from jail.

(T.T. at p.4360-61) During Bergrin I, however, the following colloquy took place while Young

testified:

A: Your words [Bergrin] was at the meeting was, y'all need to get rid of him and not let this guy testify against Mr. Baskerville.
Q: Did you ever hear me say the words to the effect of it Kemo was dead, then Will will come home from jail? Did you ever hear me say those words?
A: You said, If Kemo wasn't around, I will get Will Baskerville out of jail.
Q: But you never heard me say the words – listen to my question specifically – if Kemo was dead, Will Baskerville would definitely come home from jail?
A: No, you never said that.
Q: I never said anything like that; right?
A: No, you never said that.
(Off the record discussion)
Q: And you knew how important each and every word was; correct?
Q: Well, I knew exactly what you was talking about.
Q: You knew how important each and every word was; correct?
A: I wouldn't say each and every word, no, sir, not at all of them. But I know they're important. . . .
Q: I turn you now to page 4360 of the transcript dated October 13th of 2007. I ask you to look specifically at lines nine and 10. 4361, lines nine and 10.
A: What date you say this was?
Q: That's the date of April the 13th of 2007, the transcript. Didn't you testify under oath on that day that Paul Bergrin said, Paul Bergrin said – lines nine and 10.
A: Yes.
Q: That "if Kemo was dead," right? Is that the words that came out of your mouth that I supposedly said?
A: Yes, I said that, but that mean get rid of him.
Q: And that wasn't true, Mr. Young, correct?
A: No, you didn't say "dead." You just said get rid of him.
Q: That wasn't true; correct, Mr. Young?
A: No, it wasn't. You didn't say "dead."
Q: But you told a jury that those words came out of my mouth, that's what –

THE COURT: Mr. Bergin, you're going to have to let him answer
the question.

MR. BERGRIN: I'm sorry, Judge.

THE COURT: All right? You're going to have to slow down. You
just can't ask another question and another question. Okay?

Q: Those are the words that came out of your mouth that I said;
right?

A: Yes, sir.

Q: And that was not the truth, isn't that a fact?

A: You didn't say "dead." You just said get rid of him.

Q: But you said and told this jury that I used the words "dead" and
you heard those words come out of my mouth; correct?

A: Yes.

(Crim. No. 09-369 ECF 316 at p.177-79)

Petitioner fails to show that the fact that Young testified that Bergrin used the word

"dead" at his trial was material. Indeed, as Young explained, he took Bergrin's words that they

should get rid of Kemo. Petitioner fails to show how this difference in Young's testimony at his

trial would have changed the outcome of his proceeding, even if petitioner could somehow show

the other elements of satisfying this claim. Accordingly, this claim will be denied.

q. Presence of Diedra and Rakeem in vehicle

Petitioner next argues as follows:

> Bergrin was provided, via discovery in his case, with a call
> chronology prepared by Agent Manson/Brokos relative to calls
> made on the day (11/23/03) [sic] I was arrested between Bergrin
> and Diedra Baskerville, Bergrin and Hakeem Curry, and Curry and
> Rakeem. Bergrin used those call records to establish that Young's
> testimony at my trial was false on the matters of the presence of
> Diedra at the meeting on the day of my arrest, and the presence of
> Rakeem in Curry's vehicle on that same day when Curry received
> a call from Bergrin because the information Bergrin was provided
> with in discovery showed that Bergrin called Diedra at home (and
> she thus could not have been at the meeting Young said she was at)
> and showed that Curry called Rakeem within two minutes of the
> call with Bergrin (showing that Rakeem was not present in the
> vehicle with Curry when he got the call from Bergrin).

(ECF 1-1 at p.14-15)

The variation of Young's testimony regarding who got into the passenger side of the car is not material. Indeed, as the government notes, the importance of this testimony is not who was sitting in the passenger seat, but the substance of the phone call between Bergrin and Curry is what was material. Furthermore, during cross-examination in Bergrin I, Young attempted to explain his testimony by stating that Diedra was only at the meeting for part of the time and that she would have had time to get home prior to Bergrin's phone call to her. (*See* Crim. No. 09-369 ECF 296 at p.160) The inconsistency of Young's testimony on this point raised by petitioner does not rise to the level to warrant granting federal habeas relief because it was not material.

    r.   Inconsistencies between Young's testimony and two other witnesses

Petitioner next claims that he is entitled to relief because Young's testimony contradicted the testimony of two other witnesses, Paul Feinberg, Esq. and Rashidah Tarver. To reiterate, Feinberg was Young's attorney for a short time period between 2004 and 2005. He testified during Bergrin I that Young should tell the truth if hew to speak to the F.B.I. (*See* Crim. No. 09-369 ECF 317 at p.31) However, Feinberg also testified during Bergrin I that he told Young that he should not implicate himself and that he should "take the Fifth" if he was about to. (*See id.*) Young testified during Bergrin I that Feinberg never told him to tell the truth, only that he told him not to incriminate himself. (*See id.* ECF 315 at p.164)

With respect to Tarver, petitioner argues as follows:

> At his 2011 trial, Bergrin called Rasheeda [sic] Tarver as a defense witness. She testified that she was the girlfriend of Anthony Young for a-year-and-a-half (May of 2003 through January of 2005) and that Young had threatened her and burned her house down. Young called her in late January of 2005 and told her he was standing in a crowd when he witnessed someone named Malsey kill McCray. In a subsequent version of the same event Young told her Hak killed McCray, and in a third version Young said he killed McCray. Young told her that he could not say that someone else did it and

that he had to tell "them" that he did it. Ms. Tarver believed that Young was just throwing out stories so that she would be on the same page as him. Young would call Ms. Tarver 10 times a day but she would only accept about 6 and that each time Young would tell her a new version of the events and try to convince her to go with him into witness protection. Young told her that he was not going back to jail for anything and that he was going to tell the FBI whatever they wanted to know. Ms. Tarver also testified (contrary to what Young said at my trial) that she has never taken Young and Rakeem to an auto body shop on 12th Street in Newark or anywhere else, and that she has never seen Rakeem with a gun. Ms. Tarver told that same information to Agent Manson/Brokos. Ms. Tarver also said that Young had never discussed with her anything about a murder of a young girl in Irvington, nor did she discuss that topic with Jamal Baskerville or her best friend whom is Jamal's wife.

(ECF 1-1 at p.16-17)

Petitioner fails to show that he is entitled to relief on this claim. With respect to Feinberg, petitioner does not point to any inconsistency with respect to what occurred at his trial. Instead, he appears to note inconsistencies between Young and Feinberg in Bergrin I. Furthermore, this inconsistency, even if applicable during petitioner's trial, falls short of showing Young perjured himself and does not establish that the government knowingly utilized perjured testimony. *See Boyd v. United States*, No. 13-2587, 2016 WL 8692850, at *3 (D.N.J. Apr. 8, 2016) (citing *United States v. Thompson*, 117 F.3d 1033, 1035 (7th Cir. 1997)).

With respect to Tarver, petitioner merely shows inconsistencies between her testimony and Young, not that such amounted to perjury on the part of Young during his trial. Furthermore, he fails to show how the prosecution knowingly purportedly used such false testimony. As one court in this District has noted, "unwitting use of perjured testimony does not establish prosecutorial misconduct." *Boyd*, 2016 WL 8692850 at *3 (citing *United States v. Connolly*, 504 F.3d 206, 212-12 (1st Cir. 2007)). Accordingly, petitioner is not entitled to relief on this claim.

iv.     *Additional Inconsistencies/Conflicts as to Highly Material Matters*

Petitioner next relies on a filing by Bergrin in his criminal matter to support further

purported inconsistencies at his trial regarding what petitioner claims are highly material matters.

More specifically, petitioner cites to a post-trial July 15, 2013 filing by Bergrin after he was tried

and convicted at his second trial in 2013. Petitioner states as follows in his declaration to support

this claim:

> (1) Via a supplemental filing by Bergrin in his case dated July 15,
> 2013, Bergrin notes that he was provided with some audio
> recordings from *United States v. Hakim Curry*, that were
> inadmissible due to improper sealing. In footnote 1 Bergrin wrote
> the following about those recordings: "Despite the inadmissibility
> of the recordings, the government was fully cognizant of their
> substance; yet they knowingly and intentionally admitted evidence
> diametrically opposed and inconsistent with their contents.
> Furthermore, they permitted false testimony to be presented to the
> jury and argued that wrongful and improper inferences be adduced
> and drawn from this inadmissible evidence . . . ."

> (2) On page 2 of that same supplemental filing Bergrin explained
> that the government knew and had evidence that Young was being
> deceptive when he alleged and swore that on the date of November
> 25, 2003 Rakeem was in Curry's vehicle at 10:30 a.m. when Curry
> spoke with Bergrin about my case and that Rakeem and Curry,
> while together in Curry's vehicle, determined that the name
> mentioned by Bergrin was "Kemo" not "Kamo", and that Curry,
> Young, Hamid, and Rakeem met during the morning hours of
> November 25, 2003, and discussed my being arrested and that
> based on the charges, they had no knowledge that I was facing life
> in prison. The Curry intercepts clearly and unequivocally prove the
> false nature of Young's testimony at my trial on these material
> matters.

> (3) On page 3 of the supplemental filing Bergrin explained that the
> government wrongfully misrepresented to the court and the trial
> jury in the Bergrin case that December 4, 2003 was the date of the
> meeting that Young claimed Bergrin had with a group of people
> about my case. The recordings conclusively demonstrate that
> Young committed perjury, and that the government knew of and
> failed to correct the same, on that matter.

(4) On pages 3-4 Bergrin wrote that AUSA Minish, during his summation, informed the jury that the event of significance that happened after Thanksgiving is my detention hearing on December 4, 2003 because that was the first time Bergrin and I were told I was facing life. However, three of the inadmissible recordings show chronologically: (a) that Bergrin informed Curry that the evidence independent of McCray was no less than overwhelming, and that I would likely get a bail; (b) that Bergrin had to end a call and told him he would call back later because he was too busy to talk; and (c) that Bergrin could get a me 13 year plea deal and will call Curry tomorrow. That all clearly shows that Bergrin did not himself believe (much less convey to anyone) that I was truly going to receive a life sentence on the non-violent drug charges I was facing and that the evidence against me was very strong even without McCray as a witness (so there was thus no reason to harm him or try to procure his absence). But, and most importantly, it all conclusively proves that no meeting between Bergrin and a group of people that included Curry, Young and others, ever happened, and especially not on December 4, 2003.

(5) On page 4 Bergrin wrote that AUSA Minish relied on the December 4, 2003 date in his argument to the jury.

(6) Also on page 4 Bergrin wrote that the recorded calls from December 4, 2003 and an intercepted calls between Curry and Jarvis Webb on November 26, 2003, of which the government was fully and indisputably aware of, establish that Bergrin made it abundantly clear to Curry that the evidence against me on the drug charges was overwhelming totally independent of any testimony by McCray.

(7) In footnote 3 Bergrin wrote that in a November 26, 2003 intercept Curry and Webb have a discussion just after Curry left Bergrin's law office and that Bergrin informed Curry that I was only facing 12 years and would only serve about 10 years (cited as call 995, 926, 5:38 p.m. dated 26 November 2003). Further, on December 4, 2003 at approximately 5:30 p.m. (cited as recording number 135, 475), proves the government knew Curry was heading into New York City for dinner and was thus unavailable for any meetings.

(8) On page 5 Bergrin wrote that the irony is that AUSA Minish told the jury during summations: "No one is going to kill Kemo McCray if Will Baskerville was doing ten years. It wasn't going to happen. But, the November 26 and December 4 recordings that the government was indisputably aware of prove that Bergrin made it

abundantly clear to Curry that it is what I was realistically and practically facing for the non-violent sales of relatively small amounts of crack cocaine I was charged with. Those same recordings also prove that the government knew or should have known that Young's testimony on the question of how much time everyone thought I was facing was false.

(9) I was not provided with any of these calls Bergrin discusses in his supplemental filing in his case dated July 15, 2013.

(ECF 1-1 at p.17-19)

As petitioner appears to make clear in (9), this Court will construe this claim as a *Brady* claim.

Petitioner and his trial counsel dispute whether he received the wiretaps from the Curry case. Petitioner's trial counsel, Mr. Herman, states that they in fact received the Curry wiretaps from two sources; namely: (1) from individuals associated with the Curry case; and (2) from the government during the course of petitioner's criminal trial discovery. (*See* Suppl. Decl. Herman, ECF 34 Ex. 6)[10] Indeed, the issue of the tapes was discussed at trial, whereby Mr. Herman stated in open court that the government had made the Curry wiretap tapes available. (*See* T.T. at p.4780-81) Thus, this does not appear to be a situation where the government failed to turn over the Curry wiretap tapes to petitioner. Nevertheless, even if this Court were to assume that petitioner was not provided with the Curry wiretap recordings to the extent that such a decision would require a credibility determination between petitioner and his trial counsel, petitioner fails to show how they were material to his case such that they would have changed the outcome to a reasonable probability. Accordingly, this claim is denied.

---

[10] It does not appear that respondent electronically filed the exhibits attached to ECF 34, but provided this Court with a hard copy of the exhibits attached to that filing.

v.   *Eyewitness information that casts doubt on the foundation of the government's case*

   *relative to Counts 1 and 2*

In petitioner's next claim, he asserts that the testimony of Johnnie Davis (McCray's stepfather) in Bergrin I and Bergrin II provides new evidence to show that Young was not the shooter in the McCray murder. More specifically, he states as follows:

> (1) Johnnie Davis was McCray's stepfather and he was with McCray when he was murdered. Davis testified at my trial in 2007 and at Bergrin's trials in 2011 and 2013. There was new information aired at both of the Bergrin trials relative to this eyewitness that was not aired at my trial.

> (2) At my trial Davis testified that he and McCray were walking from a store on 20th Street and South Orange Avenue in Newark, and that when they reached 19th Street "shots rang out" and he "felt powder burns on [his] neck." (TR., at 4468-69). When he turned around McCray "was laying on the ground and a young man was tucking his gun back in his side." (TR., at 4469). The man "then turned to the car, got in the car and they sped off." (TR., at 4470-71). On the same day of McCray's murder the description Davis gave police of the shooter was that "he was dark skinned and he had dreadlocks in his hair [that were] about neck high. He was stocky build." (TR., at 4470-75). Over four months later, on July 23, 2004, Davis was called back down to the police department and was shown six photographs. He said "that the young man in the picture five matched the description of the shooter who shot [his]son." (TR., at 4475-79). It was not a positive identification but "that individual was stocky built, he matched the weight and matched the dreads that was on him." (TR. at 4477, 4479). On cross my counsel kept it minimal and did not ask the three most crucial questions left open by Davis' direct testimony, i.e.: (a) whether the shooter had a Yankee baseball cap on (Young said he had one on when he shot McCray); (b) whether he was shown a picture of Young (who was bald at the time of the McCray murder); and (3) whether he believed that Young was the person he saw shoot and kill McCray.

> (3) At Bergrin's 2011 trial Mr. Davis' testimony was consistent with his testimony at my trial on the issues of the shooter tucking his gun in the side of his pants before walking to the car, and that the man had dreads and brown skin. (Bergrin 10/25/11 TR., at 23-24). However, for the first time, at Bergrin's trial, Davis added that

the reason he was able to pick out the picture of the man he said fit the description of the shooter, on July 23, 2004, was because he saw the man on the day of McCray's murder in East Orange on Oakwood Avenue where the man asked Davis, "do you remember me?" (Bergrin 10/25/11 TR., at 32-33, 45, 55-57). On March 7, 2011 Mr. Davis met with two of Bergrin's investigators and was shown two pictures. One of the pictures closely fit the description of who he saw shoot McCray. The other picture was of Young and Davis was "sure that this man is not the shooter of Kemo." (Bergrin 10/25/11 TR., at 44-45). Davis added that Young "don't even fit the description." (Bergrin 10/25/11 TR., at 46). Davis also again said that the shooter had dreadlocks and that he did not see anyone wearing a Yankee hat. (Bergrin 10/25/11 TR. at 50, 56). Davis also verified that he signed the picture of Young twice and wrote that Young was not the shooter. (Bergrin 10/25/11 TR., at 6970).

(4) At Bergrin's 2013 trial Davis testified consistent with his prior testimony on the issues of the shooter of McCray not having a Yankees hat on and that the shooter had "shoulder-length dreadlocks." (Bergrin 2013 Tr., at 1469-71). Davis made it abundantly clear that Young was not the shooter of McCray and in doing so noted that Young was "light-skinned." (Bergrin 2013 Tr., at 1477). The man Davis identified, on July 23, 2004, as the shooter of McCray was Malik Lattimore and he believed Lattimore was the person who killed McCray because when he saw Lattimore after McCray was murdered when Lattimore asked Davis if he remembered him, he was "dark-skinned, broad shoulders, had dreadlocks, shoulder-length[,]" (Bergrin 2013 TR. at 1477-81), which was the very same description Davis gave at my trial and the police on the day of the McCray murder. (TR., at 4470-75).

(5) Mr. Davis did not testify at my trial that he was face-to-face with Malik Lattimore (whom Davis believed was the shooter) just days after the McCray murder. He was also not shown a photo of Young and asked if he was the shooter (which he would have said Young was not as demonstrated via his testimony at the Bergrin trials), and he was not asked whether the shooter had on a Yankees hat (which he would have answered no to as demonstrated via his answer in the Bergrin trials). All of this information squarely undermines Young's claim at my trial that he was the person that killed McCray. Ms. Tarver's testimony is corroborative of that point as well in conjunction with the testimony of Davis at the Bergrin trials.

(ECF 1-1 at p.19-22)

Petitioner fails to show that he is entitled to relief on this claim. Indeed, as the government notes, Bergrin was convicted of conspiracy to murder McCray in 2013. This was despite Bergrin's purported reliance on Davis's testimony in an effort to show that Young was not the shooter. It is then reasonable to assume that petitioner fails to show to a reasonable probability that his trial would have been different had petitioner pursued this further at his trial.

Respondent concedes that Davis provided a description of the shooter different than how Young described his appearance at the time of the shooting in petitioner's trial as well as in both of Bergrin's trials. During petitioner's trial, Davis testified that he did not actually see who shot McCray, but he assumed it was the person whom he saw put the gun in his side after the shots were fired. (*See* T.T. at p. 4472) He then described this man as dark-skinned with dreadlocks in his hair and a stocky build. (*See id.*) However, the contrast of Davis's description of the shooter having dreadlocks compared to Young's appearance at his trial was noted to petitioner's jury. Accordingly, petitioner fails to show how he is entitled to relief on this claim.

CC.    Claim XXXI - Prosecutorial Misconduct

In petitioner's final claim, he raises several prosecutorial misconduct arguments. A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *See Darden v. Wainwright*, 477 U.S. 168, 182-83 (1986). A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks and citation omitted). A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). A "reviewing court must examine the prosecutor's offensive actions in context and in

light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

Each of petitioner's prosecutorial misconduct arguments will be considered in turn.

i.      *Failure to disclose evidence*

Petitioner first argues that the government withheld audio recordings from petitioner during his case. Petitioner alludes to the audio recordings from Hakeem Curry's criminal case, Crim. No. 04-280.

As previously noted, petitioner's trial counsel state that they received the Curry wiretap recordings, and this is supported by counsel's statements at petitioner's trial. However, petitioner's counsel was concerned that they would have corroborated large portions of Young's testimony that would have been detrimental to the defense. While petitioner and his counsel dispute whether the recordings were received, even if they were not, petitioner fails to establish how these recordings would have had a substantial influence on the jury's verdict against him. Furthermore, to the extent this claim could be construed as a *Brady* claim, petitioner fails to show materiality of the audio recordings. Accordingly, he is not entitled to relief on this claim.

ii.     *Government allowing perjured testimony on material matters to go uncorrected:*
Next, petitioner again attempts to assert that the government allowed perjured testimony on material matters to go uncorrected. This Court has already analyzed and denied this claim in this Opinion and need not do so again here.

*iii.* *Government presented different theories of motive for McCray murder at petitioner and Bergrin's trials*

Petitioner's argument within Claim XXXI that the government presented different motive theories at his and Bergrin's trials also has been previously analyzed and denied. *See supra* Part IV.BB.i. Thus, it need not be analyzed again here.

*iv.* *Government gaining unfair advantage and able to obtain favorable evidentiary rulings due to lack of disclosure of newly discovered evidence*

Petitioner next argues that the government engaged in misconduct by gaining an unfair advantage being able to obtain favorable evidentiary rulings due to its lack of disclosure of newly discovered evidence. Beyond this conclusory statement, petitioner does not provide sufficient facts for which could potentially entitle him to relief. Accordingly, this claim is denied.

## V.    MOTIONS TO EXPAND THE RECORD

After this matter was fully briefed by the parties, petitioner made several filings seeking to expand the record in this case. (*See* ECF 36, 40, 43) In ECF 36, petitioner seeks to expand the record because the government submitted a wrong DEA -7 form. Petitioner seeks to include the correct DEA – 7 form along with a copy of fingerprint analysis that corresponds to those forms. The government did not file a response in opposition to this request. This Court does not see a reason to deny petitioner's request. Accordingly, it will be granted.

In ECF 40, petitioner also seeks to expand the record. Petitioner seeks to expand the record in this filing with the following:

1. A letter from Charles Madison addressed to Lawrence Lustberg, Esq., dated January 17, 2014. (*See* ECF 40 at p.10-12)

2. A transcript of an interview of Hassan Miller. (*See* ECF 40 at p.14-50)

3. A certification from Michael McMahon. (*See id.* at p.52-53)

4. A file preparation checklist regarding the murder of Kemo McCray (*See id.* at p.59-63)

5. Various police reports (*See id.* at p.65-73)

Mr. Madison states in January 17, 2014 letter to Mr. Lustberg that he has known Anthony Young since they were adolescents. (*See id.* at p.10) He states that he received a phone call from Young in September 2005 while Young was incarcerated. Young apparently was calling Madison from a cell phone. According to Madison, Young told him as follows:

> [Young] firmly stated that he was tired of doing time. I asked him if he had thought this thru and his response was "yes." I asked him what he had to do and he said he had to tell these people some information about who they were interested in (Hak, Rakeem Baskerville, Paul Bergrin) and the murder of some guy named Kimo. He said he didn't do the shooting but would confess to it as long as he got a lighter sentence in return. He spoke about Paul, but said he didn't do shit and he had to make up some bullshit about a meeting that supposedly took place because they kept pressuring him about Paul (he actually laughed like it was funny after he made the statement. He said he lied and told them that Paul held a meeting and told them to kill this kid Kimo. I asked him if there was ever a meeting and he said "hell no, Paul didn't do anything but if I don't say that my deal is off the table.

(*Id.* at p.11)

Mr. Miller's statement is from a transcribed interview he did with Bergrin's investigators on December 3, 2013. In that interview, Mr. Miller states that while incarcerated with Young, Young told him that he was going to lie and say that Hakeem Curry and Bergrin had something to do with the murder on South Orange Avenue (presumably McCray). (*See id.* at p.22)

Given the nature and substance of the material that petitioner seeks to expand the record with in ECF 40, along with the fact that respondent has not filed any response to this specific request by petitioner, this Court will order respondent to file a response to petitioner's motion to expand the record in ECF 40. The response should specifically and expressly address each piece of evidence within ECF 40 that petitioner seeks to expand the record with and what impact each

piece of evidence within this motion to expand has on petitioner's motion to vacate, set aside or correct his sentence. Most particularly, the government shall address whether the documents petitioner seeks to expand the record with in ECF 40 relate to previously raised claims, or if they constitute new claims. Furthermore, the government's response to the motion to expand the record shall specifically address whether, if this Court considers these documents as "new claims," whether they are timely and/or whether there are any other procedural hurdles petitioner needs to satisfy for this Court to consider the "new claims" on their merits (and if so, whether petitioner has satisfied those procedural hurdles).

In ECF 43, petitioner filed yet another motion to expand the record. Among the items that petitioner seeks to expand the record on in this filing are as follows:

1. Handwritten cover page of Bergrin's reply to the Government's opposition to Bergrin's § 2255 motion. (*See* ECF 43 at p.9)

2. Call log from November 25, 2003. (*See id.* at p.10)

3. FBI Case Update Report – Hassan Miller Background dated June 10, 2005 (*See id.* at p.12-18)

The government expressly states that it does not oppose this specific motion by petitioner to expand the record. (*See* ECF47) Accordingly, this motion will be granted.

## VI.    CERTIFICATE OF APPEALABILITY ON DENIED CLAIMS

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2255. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's

resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell,* 537 U.S. 322, 327 (2003). Applying this standard, the Court finds that a certificate of appealability shall not issue on the claims denied in this opinion. This Court reserves judgment on whether a certificate of appealability should issue on the remaining claims until after a hearing is completed and this Court issues its opinion on the merits on the remaining claims.

## VII.   CONCLUSION

For the following reasons, respondent will be ordered to file a response to petitioner's motion to expand the record. (*See* ECF 40) This Court will conduct an evidentiary hearing on the following claims:

1.  Claim V Part v - Whether trial counsel was ineffective for failing to investigate/call Hakeem Curry and Rakeem Baskerville as witnesses.

2.  Claim XXX Part ii – Failure to provide petitioner with a copy of Roderick Boyd's F.B.I. 302 report.

Counsel will be appointed to represent petitioner at an evidentiary hearing on these issues. Appointed counsel will also be given the opportunity to file a reply brief to respondent's response to petitioner's motion to expand the record. (*See* ECF 40)

The Court will reserve judgment on Claim XXIX – petitioner's cumulative ineffective assistance of counsel claim considering the evidentiary hearing that will take place with respect to trial counsel's purported failure to investigate/call Hakeem Curry and Rakeem Baskerville.

The remainder of petitioner's claims are denied. A certificate of appealability will not issue on these denied claims. An appropriate order will be entered.

DATED: November 15 2018

Peter G. Sheridan
_____
PETER G. SHERIDAN
United States District Judge